# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| UNDER SEAL | § | **<u>FILED UNDER SEAL</u>** |
| | § | |
| Plaintiffs | § | |
| | § | **QUI TAM PLAINTIFFS/RELATORS'** |
| | § | **COMPLAINT** |
| vs. | § | **PURSUANT TO 31 U.S.C.** |
| | § | **§§ 3729-3732, FEDERAL** |
| | § | **FALSE CLAIMS ACT** |
| | § | |
| UNDER SEAL | § | **Case No. _____** |
| | § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

## QUI TAM PLAINTIFFS/RELATORS' COMPLAINT

## (UNDER SEAL)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Ex rels.* Michael J. Fisher, and Michael Fisher, | § | Case No. _____ |
| Individually,  Douglas  Albro  and  Douglas | § | |
| Albro, Individually, Paris Smith and Paris | § | QUI  TAM  PLAINTIFFS/RELATORS' |
| Smith, Individually,   Shaun Schimmelman | § | COMPLAINT |
| and Shaun Schimmelman, Individually, Maria | § | |
| Borse and Maria Borse, Individually. | § | FILED UNDER SEAL |
| | § | PURSUANT TO 31 U.S.C §§ 3729-3732 |
| Plaintiffs, | § | (FEDERAL FALSE CLAIMS ACT) |
| | § | |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| Nationstar  Mortgage,  LLC  and  Nationstar | § | |
| Mortgage Holdings, Inc. (NYSE:NMS), | § | |
| | | |
| Defendants. | | |

## QUI TAM PLAINTIFFS/RELATORS' COMPLAINT
## PURSUANT TO 31 USC §§ 3729-3732, FALSE CLAIMS ACT

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher, Douglas Albro, Paris Smith, Shaun Schimmelman and Maria Borse**

/s/ Samuel L. Boyd
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe Texas
Texas SBN: 10668280
BOYD & ASSOCIATES, PC
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Tel (214) 696-2300
Fax (214) 363-6856
sboyd@boydfirm.com

***Counsel for Qui Tam Plaintiffs/Relators***

# TABLE OF CONTENTS

I. SUMMARY ...................................................................................................... 1

II. PARTIES ...................................................................................................... 4

III. JURISDICTION AND VENUE ...................................................................... 6

IV. HOME AFFORDABLE MODIFICATION PROGRAM ................................. 6

V. FACTS ....................................................................................................... 10

VI. NATIONSTAR HAMP AND NON-HAMP LOAN MODIFICATIONS ...................... 17

    MHA Compensation Process .......................................................................... 22

VII. FEDERAL HOUSING ADMINISTRATION ("FHA") AND VETERANS AFFAIRS ("VA") VIOLATIONS ......................................................................... 24

    A.   Nationstar Violations of FHA and VA Appraisal Requirements - Origination ..... 27

    B.    Failure to Implement an FHA-Compliant Quality Control Program ................. 29

    C.   Nationstar Violations of FHA Appraisal Requirements- Post-Default ................. 31

    D.   Examples of Nationstar's Inadequate Appraisals ....................................... 33

    E.   Nationstar's False Certifications ............................................................ 37

VIII. USPAP AND STATE APPRAISAL REQUIREMENTS ............................................. 40

IX. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES .................................. 44

    A. UDAAP and UDAP ................................................................................. 44

    B.   DODD-FRANK ACT ............................................................................... 46

    1.    Unfair ............................................................................................... 47

    2.    Deceptive ........................................................................................... 49

    3.    Abusive .............................................................................................. 50

    C.   Nationstar's Unfair, Deceptive or Abusive Acts and Practices .......................... 51

    1.   Origination – Nationstar's Unlawful Cancellation of Loans ............................. 51

    4.   Nationstar Loss Mitigation Violations ........................................................ 54

    D.    Loss Mitigation – Wrongful Delays and Denials ......................................... 57

    F.    Unlawful, Forced Advance of Escrow ....................................................... 61

    G.   "In-Flight" Modifications ....................................................................... 63

    I.    Imparting False, Misleading Information to Borrowers ................................. 66

    1.  Wrongfully Advising Borrowers Not to Make Payments ................................. 68

    K.   Bankruptcy Requirement Failures ............................................................ 70

    X.    GRAMM-LEACH-BLILEY ACT (GLB ACT), REAL ESTATE SETTLEMENT

**PROCEDURES ACT (RESPA), AND FAIR CREDIT REPORTING ACT FCRA** ............ **71**

    **A.**   **GLB Act** ................................................................................................ 71

    **B.**   **RESPA** .............................................................................................. 73

    **1.**   **Untimely Transferee/Transferor Letters to Borrowers** ........................... **75**

    **4.**   **Additional Violations of RESPA** ......................................................... **79**

    **C.**   **FCRA** ................................................................................................ 80

    **1.**   **Inadequate Reporting to Credit Reporting Agencies (CRAs)** ................. **81**

    **2.**   **False Reporting to CRAs** ................................................................... **81**

**XI.**   **NATIONSTAR DELAYED FUNDING  - LIQUIDITY ISSUES** ................... **82**

**XII.**  **FRAUDULENT MANIPULATION OF AUDITS** ........................................ **86**

**XIII.** **STATE LAWS AND REGULATIONS** ..................................................... **86**

    **A.**   **Texas Constitutional and Administrative Law** ..................................... 89

    **1.**   **Constitutional Law** .......................................................................... **89**

    **2.**   **Sims "Extensions of Credit" Triggering Section 50(a)(6) Applications** ............. **93**

    **3.**    **The Relevant Situation** .................................................................. **95**

    **4.**   **Pervasive Violations by Purchase Money Mortgage Modifications** ................... **98**

    **5.**   **Loan-to-value Ratio** ......................................................................... **99**

    **6.**   **Closing Location** ............................................................................ **100**

    **7.**   **Texas Notice of Right of Rescission** .................................................. **101**

    **8.**   **Full Amortization** .......................................................................... **102**

    **9.**   **Examples of Nationstar Texas Modification Contracts** ......................... **104**

  **10.**   **Homesteaders, In Effect, Become "Renters"** ..................................... **107**

    **B.**   **New York State Law** ....................................................................... 107

    **1.**   **3 NYCRR § 419.11** ........................................................................ **108**

    **2.**   **Nationstar Example of NY Modification Contract** .............................. **1100**

    **C.**   **Massachusetts Law** ........................................................................ 1111

    **1.**   **Mass. Right of Rescission** ................................................................ **115**

    **2.**   **Examples of Nationstar's Massachusetts Modification Contracts** .................... **116**

**XIV.** **FAILURE BY NATIONSTAR TO SELF-REPORT** .................................. **118**

**XV.**  **FALSE CLAIMS ACT** ........................................................................ **11919**

**XVI.** **CAUSES OF ACTION** ........................................................................ **122**

    **A.**   **First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)** ............. 122

**B.    Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)**........................ 1222

**PRAYER AND REQUEST FOR RELIEF……………………………………………….123**

The United States of America, by and through *qui tam* Plaintiffs/Relators Michael J. Fisher, Douglas Albro, Paris Smith, Shaun Schimmelman and Maria Borse bring this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act" or "FCA") against Nationstar Mortgage, LLC ("Nationstar") and Nationstar Mortgage Holdings, Inc. (NYSE:NMS) (collectively, "Defendants") to recover all damages, penalties, and other remedies available under the False Claims Act on behalf of the United States and Relators. In support, Relators would show the following:

## I. SUMMARY

1.      Nationstar was and is a participant in the Government's Home Affordable Modification Program ("HAMP"), through which the United States incentivizes borrowers, note owners and servicers of residential home mortgages to modify the borrowers' troubled home loans by lowering interest rates and payments, extending terms, and possibly forgiving principal, to help American homeowners avoid foreclosure and to attempt to stabilize financial markets supported by home mortgages in various formats. Nationstar, from the beginning, violated the FCA by fraudulently inducing Fannie Mae, agent for the United States, to execute two (2) Nationstar Servicer Participation Agreements ("SPA") (and exhibits) by falsely representing, warranting and covenanting therein that (1) Nationstar **was at that time [present] "in compliance with, and . . . that all Services will be performed in compliance with [future], all** applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § [sic] et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws

designed to prevent unfair, discriminatory or predatory lending practices;" (2) Nationstar obtained approvals, registrations or consents necessary for the performance of its obligations;. . . (3) the performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound . . . ; [and] (4) Nationstar is **not** aware of any other **legal or financial impediments** to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of **any** financial and/or operational impediments which **may impair** its ability to perform its obligations under the Program or the Agreement . . . .[1] Each annual recertification repeated the same or substantially similar false certifications and/or representations.[2]

2.     Nationstar  has continuously, from the beginning of the HAMP program, failed to meet the basic and fundamental federal requirements related to the  servicing of delinquent conventional and FHA loans under the "default servicing" and/or "loss mitigation" requirements— procedures designed to prevent delinquent borrowers from losing their homes, protect lenders from losing the income stream from the loan, and protect the insurer, FHA, from unnecessarily paying such lenders' claims under the FHA loan insurance programs. Nationstar knowingly failed to comply with federal and state laws (including at least Texas, New York and Massachusetts) designed to prevent unfair, discriminatory or predatory lending practices; including, but not limited

---

[1] *Nationstar Servicer Participation Agreement ("SPA") (executed by OFC)* at Exhibit A, Financial Instrument at ¶5(b), attached hereto at **Exhibit 1;** Nationstar *Amended and Restated Servicer Participation Agreement (executed by Nationstar ) ("Amended SPA")* at Exhibit B, Financial Instrument at ¶5(b), attached hereto as **Exhibit 2**.

[2] *See* Exhibit 1 at Exhibit B, Form of Annual Certification ¶ 2; Exhibit 2 at Exhibit C, Form of Certification, ¶ 2. Beginning with its September 22, 2011 Annual Certification, Nationstar certified that it was "in material compliance with and certifie[d] that its services ha[d] been performed in material compliance with" the same laws and regulations. Exhibit 1 at 2. Nationstar's conduct never approached "materially in compliance" with the relevant laws and regulations.

**Qui Tam Plaintiffs/Relators' Complaint**                                                                 **2**

to UDAAP and UDAP, and state consumer lending laws. Nationstar further failed to provide consumers with notices, when required by law, of the right to rescind HAMP and non-HAMP loan modification agreements, that added **new** debt not arising from the original note or deed of trust, entered between the borrowers and Nationstar, as objectively required by TILA and by, Texas, New York and Massachusetts laws. Moreover, Nationstar has knowingly engaged in practices designed to force Nationstar delinquent borrowers into foreclosure by way of, harmful and unlawful behavior, violating loss mitigation requirements, including those identified hereinbelow with specificity and particularity by Relators. Nationstar's fraudulent conduct and material omissions were to detriment of the borrowers and the United States, generally, while Nationstar enjoyed unlawful benefits of receiving hundreds of millions of dollars of incentive payments and increased servicing fees based on higher principal balances.

3.      The Defendants' numerous, false representations, regarding certifications, warranties, and covenants of compliance with HAMP requirements and obligations and with all the other applicable federal, state and local consumer lending laws, regulations and rules, including GSE (Fannie Mae, Freddie Mac), FHA and Ginnie Mae loss mitigation requirements, rendered the initial and sequential certifications/representations provided by Nationstar in the SPAs, and in each annual certification thereafter, material and false certification/statements. All of Nationstar's statements in its SPAs regarding present, past and future compliance with federal and state consumer and other lending laws were false statements and/or false records used by Nationstar to fraudulently induce the United States to execute and continue the SPA relationship and to,  thereby, unlawfully obtain the full range of incentive payments from the United States.

## II. PARTIES

4.      Relator Michael Fisher ("Fisher") is a citizen of the United States and a resident of Southlake, Texas. Relator was employed in the area of loan modification contracts from 2008 until early 2012. During that time, Relator served as an assistant to attorneys at law firms in Brea, California (now located in Industry, California) and Southlake, Texas, which assisted clients with obtaining modifications of their residential property mortgage loans from Nationstar and other lenders or loan servicers. He reviewed loan modification contracts for each law firm. Additionally, he has received and reviewed thousands of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including Nationstar.

5.      Relator Shaun Schimmelman ("Schimmelman") is a citizen of the United States and a resident of Dallas, TX.  Relator Schimmelman has approximately twelve (12) years in the mortgage banking industry and is a former employee of Nationstar.  Schimmelman was an AVP Operations which included duties of managing day to day production of consumer direct loan pipeline and the oversight of loan processing - from loan lock, underwriting, closing to funding. During his employment with Nationstar he became aware of significant violations of federal and state laws and regulations by Nationstar. Relator Schimmelman has direct and independent knowledge of the claims as alleged herein and is an Original Source of his claims.

6.      Relator Douglas Albro ("Albro") is a citizen of the United States and a resident of Decatur, Texas, and has 28 years of experience as an appraiser and review appraiser. Relator Albro is a former employee of Nationstar. As Senior Review Appraiser, He reviewed and analyzed residential appraisal reports from all over the United States for quality control and risk

management purposes. Relator Albro has direct and independent knowledge of the claims as alleged herein and is an Original Source of his claims.

7.     Relator Paris Smith ("Smith") is a citizen of the United States and a resident of Chandler, Arizona, and has 10 years of experience in the mortgage banking industry Relator Smith is presently employed at Nationstar as an FHLMC/FNMA Account Resolution Specialist a/k/a Single Point of Contact (SPOC). As a SPOC at Nationstar, Relator Smith receives borrowers' initial modification applications relating to non-GSE loans, respond to borrower inquiries regarding modifications and submit completed borrower packages to Underwriting.  Ms. Smith recognized significant federal and state violations, including loss mitigation violations, committed by Nationstar which were materially inconsistent with the certifications and representations in the Nationstar HAMP Servicer Participation Agreement ("SPA") and annual certifications thereafter. Relator Smith has direct and independent knowledge of the claims as alleged herein and is an Original Source of her claims.

8.     Relator Maria Borse ("Borse") is a U.S. citizen and resident of Dallas, TX. Ms. Borse is a current employee of Nationstar and has approximately thirteen years in the mortgage banking industry.  Realtor Borse was initially hired by Nationstar as a consultant for the bankruptcy and foreclosure departments and, thereafter, served as an employee in the origination department. Currently, Relator Borse is employed in the Servicing Integration Department.  Relator Borse has direct and independent knowledge of the claims as alleged herein and is an Original Source of her claims.

9.     Defendant Nationstar Mortgage, LLC ("Nationstar") is indirectly owned by Defendant Nationstar Mortgage Holdings, Inc. (NYSE: NMS) (hereinafter "NMS") through NMS

subsidiaries Nationstar Sub1 LLC ("Sub1"), a Delaware LLC, which owns 99% of Nationstar, and

Nationstar Sub2 LLC, which owns 1% of Nationstar. Defendant NMS is a non-bank residential

mortgage servicer offering a range of services across the residential mortgage product spectrum.

Nationstar and NMS are located at the same address in Coppell, Texas and share numerous officers

and directors, including most notably Nationstar CEO Jay Bray, who is the President and CEO of

NSM. NMS completely controls Nationstar, and Nationstar is an alter ego of NMS. Defendants

can be served with process by making service upon its registered agent for such service,

Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

## III. JURISDICTION AND VENUE

10.     This matter is within the Court's federal question jurisdiction, as Relators bring this

action under 31 U.S.C. § 3730(b)(1). Venue is proper, pursuant to the FCA, 31 U.S.C. § 3732(a),

in the Eastern District of Texas, where Nationstar transacts substantial business and where

violations of the FCA occurred in part.

## IV. HOME AFFORDABLE MODIFICATION PROGRAM

11.     In approximately mid-to late 2008, an industry sprang up to help financially

troubled homeowners save their homes by negotiating loan modifications with the servicers[3] of the

loans. In the third quarter of 2009, the U.S. Treasury Department rolled out the Home Affordable

Modification Program ("HAMP")[4] to encourage lenders to modify home-secured loans. Under

---

[3] A loan servicer is an entity that may or may not be the original lender or the owner of a loan. It need not be a bank but may be. Servicers that are not the owners are paid by the owners of the loans to collect monthly payments and generally manage the borrowers' accounts on a day-to-day basis. Servicers sometimes buy the right to service groups of loans.

[4] In addition to the Treasury Department's HAMP program for non-GSE loans—loans not owned by Government-Sponsored Entities, the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac)—Fannie Mae, Freddie Mac, the VA, and the FHA

HAMP, loan servicers, investor/owners of loans, and borrowers receive incentive payments from the Government in connection with granting the modification and keeping the modified payments current (borrowers' incentives are paid to the servicer to be applied as principal reduction paid to the owner/investor). On August 19, 2010, pursuant to its Supplemental Directive 10-09,[5] the Treasury Department issued the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages[6] ("MHA Handbook"), which governs the procedures for HAMP loan modifications.

12.     The MHA Handbook states "[t]his Handbook constitutes Program Documentation under the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation Agreement."[7] The SPA is part of the uniform agreement between a servicer and the Government's financial agent Fannie Mae as designated by the Treasury Department ("Commitment to Purchase Financial Instrument and Servicer Participation Agreement"), pursuant to which the servicer may participate in HAMP, 2MP (Treasury and HUD's Second Lien Modification Program), Treasury FHA-HAMP, RD-HAMP (Department of Agriculture's Rural Housing Service HAMP program), or FHA2LP (FHA refinance program for underwater loans) for

---

administer their own versions of HAMP pursuant to the Government's Making Home Affordable initiative.
[5] Supplemental Directive 10-09, available at
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1009.pdf (last accessed Nov. 7, 2014). On March 1, 2013, Supplemental Directive 13-01 issued, effective May 1, 2013.
[6] Non-GSE mortgages are mortgages not owned by government-sponsored entities ("GSEs") such as the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac).
[7] *MHA Handbook v. 4.3*, at p. 14,
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_43.pdf (last accessed November 7, 2014). On March 3, 2014 the Treasury Department issued Version 4.4 Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages.

loans that are not owned, securitized, or guaranteed by Fannie Mae or Freddie Mac, and the Government compensates the servicer, loan owner(s), and borrower(s).

13.     In the MHA Handbook v. 4.3, every servicer is put on notice of the following requirement:

**1.6 Compliance with Applicable Laws**

Each servicer and any sub-servicer that the servicer uses will be subject to and must fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions…

*MHA Handbook v. 4.3*, at p. 32 ¶ 1.6.

14.     Under HAMP, incentive fees paid to the servicer by the Government, which currently can equal up to $4,600 per HAMP modification, and similar, separate fees paid by the Government to the lender/investor owners of the loans, are designed to fully compensate the servicer and investor owners for all costs associated with granting the HAMP modification.

15.     The United States also pays up to $83.33 per month for the benefit of borrowers, to be applied to the borrowers' loan balance as principal reduction, accruing monthly and paid annually for the first five years as long as the loan is in good standing where the modification reduces the monthly housing expense by 6% or more and the property is owner occupied. These payments are made by the Government to the servicer for payment to the owner/investor as credits to the borrower's loan balance.[8] Thus the United States pays for the benefit of the borrower (and the owner of the loan, which receives payment on the loan) up to a maximum of $5,000.

---

[8] Exhibit 3, *MHA Compensation Matrix*, at p. 2, § 5; MHA Handbook v. 4.3, at pp. 141 ¶ 13.2.

16.     Pursuant to the *current* HAMP servicer Compensation Matrix, last updated November 3, 2014, a servicer receives a one-time payment of $400-1600 from the Government for each completed permanent HAMP modification with an effective date of the trial period plan on or after October 1, 2011 and before March 1, 2014; the amount of this incentive payment depends on the number of days the specific loan was delinquent.[9] The Compensation Matrix was previously updated several times (including an update effective October 1, 2011 to reflect changes to servicer incentives detailed in Treasury Supplemental Directive 11-06 Making Home Affordable Program—Updates to Servicer Incentives). Under the incentive schedules prior to these changes, the servicer received $1,000 for each completed modification under HAMP with a trial period plan effective date before October 1, 2011, without regard to whether the borrower was delinquent; however, for permanent HAMP modifications with a trial period plan effective date before October 1, 2011, the servicer received an additional $500 if the borrower was not delinquent at the time of the modification[10] for a maximum one-time, initial payment of $1,500 under pre-October 1, 2011 incentive schedules.[11]

17.     In addition to the initial modification completion incentive payment, servicers are paid "Pay for Success" incentives of up to $83.33 per month, which are accrued monthly and paid annually on the anniversary date of the permanent HAMP loan modification for a period of thirty-six (36) months for modified loans that remain in good standing. Thus, servicers may, post-October

---

[9] *MHA Compensation Matrix*, last updated November 3, 2014, available at
https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/mhacompensationmatrix110314.pdf

[10] This payment is no longer applicable, for modifications with a post-October 1, 2011 effective date.

[11] *MHA Compensation Matrix*, last updated November 3, 2014 at p. 1-2; *see also* MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3.

**Qui Tam Plaintiffs/Relators' Complaint**                                                                **9**

1, 2011 plan, be paid up to $4,600 for a permanent HAMP loan modification that continues in good standing for thirty-six (36) consecutive months ($1,600 for modification plus $3,000 maximum total good standing payments). Prior to October 1, 2011, the servicer could be paid up to $4,500 for a permanent HAMP loan modification where the borrower was not delinquent at the time of the trial period effective date and continued in good standing for thirty-six (36) consecutive months ($1,000 for modification plus $500 bonus plus $3,000 maximum total good standing payments); for a borrower who was delinquent at the time of the trial period effective date, the servicer could be paid up to $4,000 ($1,000 for modification plus $3,000 maximum total good standing payments).[12]

18.     Investors/owners of the loans are paid an initial, one-time modification fee of $1,500 for modifications that lower the monthly housing expense by 6% or more and the property is owner occupied. Investors are paid by the United States (via payment to the servicer for the investor) good standing incentives accruing monthly and paid annually for up to five years pursuant to more complex formulas. Investors can also receive Investor Home Price Decline (HPDP) Incentive Payments for two years or Principal Reduction Alternative Payments for up to three years, pursuant to similar formulas based in part on amount of principal reduced.[13]

## V. FACTS

19.     Jay Bray, Chief Financial Officer of Nationstar, executed on behalf of Nationstar on May 28, 2009 a Commitment to Purchase Financial Instrument and Servicer Participation

---

[12] Exhibit 3, *MHA Compensation Matrix* dated July 31, 2012, at pp. 1-3; MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3.

[13] *MHA Compensation Matrix*, dated July 31, 2012 at pp. 1-3, §§ 3 -7 (Exhibit 3); MHA Handbook v. 4.3, at pp. 142-144 ¶ 13.3.4.2 (formulas for investor incentives).

Agreement ("SPA") with Fannie Mae as financial agent for the United States[14] On or about September 24, 2010, Bray executed an Amended and Modified Commitment to Purchase Financial Instrument and SPA with Fannie Mae as financial agent for the United States.[15] Nationstar continues as a HAMP participant and the obligations, representations, warranties and covenants of Nationstar under its agreement survive the expiration or termination of its agreement effective May 28, 2009.[16]

20.     Nationstar's SPAs (**Exhibit 1 & 2**) reflected false representations, warranties, and certifications by Nationstar, the Servicer, in the SPA and in subsequent annual certifications:

> Servicer's representations and warranties, and acknowledgement of an agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Programs and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as <u>Exhibit C</u> (the "<u>Certification</u>"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below) and upon the execution and delivery by Servicer of any Additional Service Schedule during the Term.

**Exhibit 1, Nationstar SPA, at p. 2 ¶ B; Exhibit 2, Nationstar Amended and Restated SPA, at p. 2 ¶ C.**

21.     In paragraph 5(b) of the "Representations, Warranties and Covenants" of the Financial Instrument, which is a part of the SPAs[17], at the time of executing its agreement, Nationstar represented, warranted, and covenanted that:

---

14 Exhibit 1, Nationstar *Original SPA*

15 Exhibit 2, Nationstar *Amended and Restated SPA*

16 Exhibit 1 at p. 1. *See also* **Exhibit 7**, *Non-GSE Servicer Participants*, <u>http://www.makinghomeaffordable.gov/get-started/contact-mortgage/Pages/default.aspx</u> (click the letter "N" under "Mortgage Servicers" (last accessed March 18, 2014).

17 *See* Nationstar SPA, Exhibit 1, at p. 10 ¶ 11.G ("The Commitment, together with the Financial

(b)    Servicer is [present] in compliance with, and covenants that all Services will be performed [future] in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq. [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement.

**Exhibit 1, Nationstar SPA, at Exhibit A pp. 2-3 ¶ 5(b); Exhibit 2, Nationstar Amended and Restated SPA, at p. B-3 ¶ 5(b).**

22.    The following certification is included in the Certificates executed and delivered annually to the Government by Nationstar, beginning on June 1, 2010, and again on June 1 of each year during the Term of the Agreements, pursuant to Section 1.C of Nationstar's SPAs, as well as paragraph 5(l) of their Financial Instruments, each of which are incorporated in and part each of the SPAs. **Exhibit 1,** *Nationstar SPA***, at Exhibit A p. 4 ¶ 5(l) and Exhibit 2,** *Nationstar Amended and Restated SPA***, at pp. B-4—B-5 ¶ 5(l).**[18]

---

Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitute the entire agreement of the parties with respect to the subject matter hereof."); Nationstar Amended and Restated SPA, Exhibit 2, at p. 12 ¶ 11G. (same).

18 *See also* Exhibit 1, Nationstar SPA at Exhibit B Form of Annual Certification, p. 1 ¶2 and Exhibit 2, Nationstar Amended and Restated SPA at Exhibit C Form of Certification, p. 1 ¶2. **"Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and** local laws, **regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq. . . . "**

## CERTIFICATION

2.      Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq. [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.

**Exhibit 1,** *Nationstar SPA***, at Exhibit B p. 2 ¶ 2; Exhibit 2,** *Nationstar Amended and Restated SPA***, at p. C-1 ¶ 2;** *see also* **form for annual certification accessible at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreement.pdf**

23.     Nationstar falsely represented, knowingly, that it was in full compliance with the above requirements with the execution of the *original* Servicer Participation Agreement and the Certification within that Agreement (**Exhibit 1**) on May 28, 2009, as well as in its Amended and Restated Servicer Participation Agreement (and Financial Instrument) on September 24, 2010, (**Exhibit 2**), which pursuant to the HAMP program, were substantially similar, and in each annual re-certification.

24.     The representations of compliance with federal and state law made by Nationstar were express conditions of payment, and material to the decisions of the United States to approve the SPAs and to make payments in response to false claims submitted by Nationstar to the United

---

**Qui Tam Plaintiffs/Relators' Complaint**                                                    **13**

States. Paragraphs 4.A. to 4.D. of Nationstar's Servicer Participation Agreements provide as follows:

> **4.** Agreement to Purchase Financial Instrument; Payment of Purchase Price
>
> A.  Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as <u>Exhibit B</u>, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price.
>
> B.  The <u>conditions precedent</u> to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Initial Service Schedules are: (a) the execution and delivery of the Commitment, the Initial Service Schedules, and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery of the Commitment and the Initial Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Commitment, Initial Service Schedules and Financial Instrument to Treasury on the Effective Date of the Agreement; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.
>
> C.  The <u>conditions precedent to the payment</u> by Fannie Mae of the Purchase Price with respect to the Services described on the Additional Service Schedules (if any) are: (a) the execution and delivery of the Additional Service Schedules and the Certification by Servicer to Fannie Mae; (b) the execution and delivery of the Additional Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Additional Service Schedules to Treasury; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.
>
> D.  Solely in its capacity as the financial agent of the United States, and subject to subsection E. below, Fannie Mae shall remit

all payments described in the Program Documentation to Servicer for the account or credit of Servicer, Investors and borrowers, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit or account of third parties under the Program Documentation shall be applied by Servicer as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the applicable Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

**Exhibit 1, Nationstar *SPA*, at pp. 3-4 (emphasis added).**

25.     Nationstar's Amended and Restated SPA also confirms that the execution and delivery of the "**Certification by Servicer** to Fannie Mae" is a **condition precedent to payment**:

The ***conditions precedent to the payment by Fannie Mae of the Purchase Price*** with respect to the Services described on the Additional Service Schedules (if any) are: (a) the execution and delivery of the Additional Service Schedules and the ***Certification by Servicer to Fannie Mae***; … and (e) **such other obligations** *as are set forth* in the **Agreement**.

**Exhibit 2, Nationstar Amended and Restated SPA at p. 4**

26.     Nationstar acknowledged in the **Financial Instruments** purchased by Fannie Mae pursuant to the Commitment to Purchase Financial Instrument and Servicer Participation Agreements between Fannie Mae and Nationstar that providing false or misleading information to Fannie Mae or Freddie Mac in the HAMP Program may constitute violations of (1) federal criminal laws found in Title 18 of the U. S. Code or of the **civil False Claims Act (31 U.S.C. §§ 3729-33)**:

(f)     Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the

Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud**,** conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

**Exhibit 1, Nationstar SPA, at Exhibit A p. 3 ¶ 5(f); Exhibit 2, Nationstar Amended and Restated SPA, at p. B-4 ¶ 5(f)** (emphasis added). Given the scope of the express representations, warranties, and covenants and the Servicer's continuing obligations of truthfulness and accuracy as set forth in the introduction to paragraph 5, Nationstar was on notice of the obligations of truthfulness and accuracy and expressly acknowledged that failures to fulfill these obligations could lead to criminal and False Claims Act prosecution:

5. **Representations, Warranties and Covenants**. Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

**Exhibit 1, *Nationstar SPA*, at Exhibit A p. 2 ¶ 5; Exhibit 2, *Nationstar Amended and Restated SPA*, at p. B-2 ¶ 5.** Nationstar has **knowingly** failed to notify the government as required when its certifications and representations, including, compliance with federal, state and local laws, regulations, rules and requirements, have been false. Nationstar's violations of its many duties, as well as the concealment of those violations, as set forth herein, made false, ubiquitously, the **expressly defined conditions precedent** to payment in the SPAs.

27.    In 2008, Relator, who was an employee of a Brea, California law firm, began assisting attorneys there in helping homeowners obtain home loan modifications. Relator

continued this line of work with a Southlake, Texas law firm upon moving to Texas in November of 2010 until his partial retirement in March 2012. Relator's tasks involved primary responsibility for much of the processing of loan modification applications for the firms' clients. Relator assisted a number of attorneys in successfully completing hundreds of loan modifications for clients of the two law firms and personally reviewed every one of the modification contracts and applications. Relator coordinated the modification process with twenty or more different servicers. Additionally, he received and reviewed thousands of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including Nationstar.

28.     Relator Fisher worked with his law firm employers to complete successful Nationstar loan modifications for the firms' clients. Relator reviewed and consulted on the details of each Nationstar modification agreement with the clients. As a result, Relator Fisher is aware of all of the Nationstar modification agreements between the firms' clients and Nationstar, as well as the contents of the files. This includes some modifications submitted under HAMP and non-HAMP modifications. Relator Fisher has also requested and received copies of additional Nationstar HAMP and non-HAMP modification contracts from other firms and has closely examined them all.

## VI. NATIONSTAR HAMP AND NON-HAMP LOAN MODIFICATIONS

29.     In connection with modification agreements, Nationstar operates essentially the same as most servicers who participate in the Government's Making Home Affordable (MHA) – HAMP program. Nationstar facilitates and grants modifications in two general instances. One instance involves making modifications pursuant to guidelines that are established by the Treasury Department for the Government's HAMP program and then submitting a claim for payment of

incentive fees by the U.S. Government pursuant to HAMP policies. The second instance involves modification of loans that are outside of HAMP, wherein the servicer and investor or lender owning the loan determine the relevant guidelines. On the non-HAMP modifications, a servicer does <u>not</u> submit a request for Government payment, but may look to the borrower to compensate the servicer instead.

30.     The two types of modification contracts are usually similar in form and substance. The HAMP modifications generally include more restrictive requirements for an approval of a permanent modification and subsequent incentive payments by the U.S. Government. The non-HAMP modifications have more flexibility for approval and do not have the requirement to be completed within the strict boundaries of the MHA Handbook. Like virtually every servicer who is a participant in the HAMP program, Nationstar generally uses one of two standard contract formats for borrower modifications. One contract format is used for HAMP-submitted modifications and another format is used for non-HAMP modifications.

31.     In the numerous HAMP and non-HAMP Nationstar loan modifications reviewed by Relator, Nationstar virtually always loaned new amounts of principal to the borrower in the form of amounts (1) past due, (2) not yet due, and (3) of advances **never** actually made, which were then added [capitalized] to the loan's unpaid principal balance. The amount of the new, additional loan advances made to borrowers in modifications reviewed by Relator, above and beyond the principal balance owed prior to the modification, typically amounted to tens of thousands of dollars. The capitalized amount included delinquent interest, property taxes, and various, undefined and undisclosed modification fees and costs **not** arising out of (i) the **original** note or (ii) deed of trust. Nationstar often capitalized a lump sum without any fair itemization of

the amount financed, making it impossible for the borrower to discern what charges were included in the new principal sum to be capitalized. On the new amounts added to the principal balance, Nationstar charged interest to be repaid over approximately 25-40 years. **Nationstar did not, however, provide the required notice of the right of rescission, notwithstanding the resulting first lien mortgage retained or acquired in the borrower's principal residence for the deferred debt payment, or the additional amount (new extension of credit) advanced and secured.**

32.     The HAMP modification agreements typically state:

> *The modified principal balance of my Note **will include** all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan.*

In many of these modification contracts with an increased per the newly capitalized debt, including past due obligations, **unloaned principal** and costs **not** arising under the **original** (i) note or (ii) deed of trust, also included the deferral of a large principal payment and were secured and finalized without providing borrowers the legally required notice of the right to rescind the new extensions of credit as stated. The Nationstar HAMP loan modifications reflected new debt balances, by capitalizing new extensions of credit, that were always substantially more than the pre-modification outstanding principal balances on the HAMP modifications reviewed by Relators. Moreover, the capitalization of new principal virtually always included, unlawfully, the principal component of the past due monthly payments.   That principal had never been loaned to the borrowers.

33.     Nationstar modification contracts contain the following or substantially similar language:

> That, I will cooperate fully with Lender in obtaining any title endorsements, or similar title insurance products, and/or subordination agreements that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such an acceptable title endorsements and/or subordination agreements, then the terms of this Agreement will not become effective on the Modification Effecitve Date and the Agreement will be null and void.

*See, e.g.,* **Exhibit 16d at p. 5, para. J.**

34.     Pursuant to the language quoted in the previous paragraph, in virtually 100% of HAMP modifications, Nationstar advances to the borrower were expressly conditioned on the advance being covered by a first lien security interest that Nationstar acquired through the credit extension under the HAMP modification. Nationstar, as the Servicer, ***acquired*** a new, first-lien security interest in the residential real property for its HAMP modification advance. The original first lien securing the original loan obligation was ***retained*** by the Investor/Note owner. This **new security interest secured** an obligation to a new lender (Servicer), and the first-lien security interest after modification covered the newly capitalized advance, which was a larger loan obligation than the previous loan obligation.[19] Thus, a security interest was both (1) **retained**

---

[19] In some modifications, Nationstar adds amounts to existing principal balances, and forgives part of the original principal. In these cases, the new loan amount is owed to and a new security interest acquired or retained by a new lender, Nationstar. The amount of principal forgiven is forgiven by the owner/investor; the newly advanced amount loaned by Nationstar is not forgiven and a new security interest in the property is acquired or retained by Nationstar.

(Investor/Note owner) and (2) **acquired** (Servicer advance).[20] Section 1635 of TILA, 15 U.S.C. § 1635, requires notice of the borrower's right to rescind consumer credit transactions in which a security interest is retained or acquired in property that will be the borrower's principal dwelling, until midnight of the third business day after consummation of the transaction or delivery of the TILA notice of right to rescind, whichever is later. 12 U.S.C. § 1635(a).[21] Refinancings *with no new advances, by the* same *creditor and secured by the same property*, and certain other transactions are exempted from the rescission provisions. 15 U.S.C. § 1635(e). The actionable conduct alleged herein involves transactions which were not refinancings and not otherwise exempted from the rescission provisions.[22] In any transaction subject to the right to rescind, the creditor must give the consumer two copies of a notice of right to rescind, which must be a separate document clearly and conspicuously disclosing the rights and process of rescission. 12 C.F.R. § 1026.23(b). Unless the consumer waives the right to rescind, which is permitted only in limited

---

[20] 15 U.S.C. § 1635; 12 C.F.R§ 1026.23(a).

[21] The federal Truth in Lending Act ("TILA") is contained in Title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq.* TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). Regulation Z, 12 C.F.R. 1026.1 *et seq.* was promulgated by the Board of Governors of the Federal Reserve System ("Board") to implement TILA and other federal consumer protection statutes pursuant to authority granted in several sections, including, primarily, section 105 of TILA, 15 U.S.C. § 1604. *See* 12 C.F.R. 1026.1(a).

[22] In most credit transactions in which a security interest is acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to a security interest has a right to rescind the transaction. 15 U.S.C. § 1635; 12 C.F.R. § 1026.23(a) (other than "residential mortgage transactions," defined at 12 C.F.R. § 1026.2(a)(24) as a transaction to finance the initial acquisition or construction of a dwelling, whether the dwelling is real or personal property, 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-1; *see also* 122 C.F.R. 1026, Supp. I, Comment 1026.23(a)). For purposes of rescission, a new advance does not include amounts attributed solely to the costs of refinancing. 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-4. None of the HAMP modifications were refinancings or consolidations under Section 1026.23(f), which requires that the previous debt be paid and replaced by a new debt to constitute a refinancing.

circumstances, no money shall be disbursed, other than in escrow, no services shall be performed, and no materials shall be delivered unless and until the three-day period passes without the right of rescission being exercised. 12 C.F.R. § 1026.23(c). Nationstar knowingly and systematically failed to provide borrowers with the required notice of right of rescission.

36.     Through August 2015, the United States has paid a total of **$521,704,265.62** in incentives for Nationstar HAMP modifications, which includes **$122,699,235.70** for the servicer, Nationstar.[23] The balance of the funds was paid for the benefit of the relevant borrowers and investors. Therefore, the approximate amount of the Government's False Claims Act single damages incurred is **$521,704,265.62**.

37.      The cap on incentives for Nationstar modifications, which is subject to periodic adjustments, is **$1,903,048,529** in potential incentive payments by the United States to the Servicer, Nationstar.**[24]**

38.     The procedure by which Nationstar has received the Government-paid incentives for Nationstar's loan modifications is as follows:

## MHA Compensation Process

1.     Servicer establishes bank account.

---

[23] *TARP Housing Transactions Report for Period Ending September 16, 2015*, at p.55, Supplemental Information [Not Required by EESA §114(a)] Making Home Affordable Program Non-GSE Incentive Payments (through July 2015),  http://www.treasury.gov/initiatives/financial-stability/reports/Pages/TARP-Housing-Transaction-Reports.aspx. Under "All Reports by Frequency," "As Indicated," click on TARP Housing Transaction Reports" and select report by date.   The Government's incentives for the benefit of the investor/lenders and borrowers, the other two express beneficiaries, are paid to Nationstar to be distributed or credited promptly to the appropriate recipient.

24 *TARP Housing Transactions Report for Period Ending September 16, 2015 2015*, at p. 29.

- Bank accounts are designated by the servicer on the HAMP Registration Form, Sections 3 and 4.

- Servicers may designate up to four accounts to allocate compensation appropriately: default, servicer, investor, and borrower accounts.

2.  Servicer submits Official Loan Setup record once trial period is complete.

    - Refer to the chart above for compensation timing considerations and requirements.

3.  Fannie Mae, as administrator for the Making Home Affordable Program, provides Cash Payment Summary Report to servicer.

    - Report includes compensation amount on a loan-level basis and indicates the associated payor: U.S. Treasury Department, Fannie Mae, or Freddie Mac.

    - Report is accessible via the HAMP Reporting Tool one business day before compensation is deposited into accounts. Deposit occurs on the 27th calendar day or first business day prior to the 27th if the 27th falls on a weekend or a holiday.

4.  Deposit is made.

    - Deposit is transferred via the Automated Clearing House (ACH) Network on 27th of the month or on the business day prior to the 27th.

**Exhibit 3,** ***MHA Compensation Matrix***, dated July 31, 2012 at p. 7. Nationstar followed this procedure and generated **$521,704,265.62** in Government incentive payments for the benefit of Nationstar, its investor/owners, and its borrowers.[25]

---

[25] *TARP Housing Transactions Report for Period Ending September 16 2015*, at p.55.

## VII.    FEDERAL HOUSING ADMINISTRATION ("FHA") AND VETERANS AFFAIRS ("VA") VIOLATIONS

39.    The FHA was created by Congress in 1934 and became part of the Department of Housing and Urban Development (HUD) in 1965. The FHA provides mortgage insurance for single-family housing loans to approved lenders to protect them against losses resulting from defaulting borrowers.[26] FHA-approved servicers are obligated to comply with all applicable laws and regulations.[27] Those servicers that fail to comply with HUD statutes, regulations, handbook requirements or mortgagee letters may be required to repay incentives received or indemnify HUD for any losses incurred.[28] After April 25, 1996, FHA ceased accepting applications for the assignment of FHA loans which had gone into default, and instead initiated a comprehensive loss mitigation program to provide relief to borrowers in default.[29] The loss mitigation program returned the responsibility for managing loan defaults to the servicer and provided financial incentives to recognize them for this effort. Pursuant to HUD regulations and guidance, FHA-approved lenders and their servicers are *required* to engage in loss mitigation to avoid the foreclosure of HUD-insured residential mortgages.[30] Nationstar has continuously failed to meet

---

[26] *See* 12 U.S.C. § 1709; *See generally* 24 C.F.R § 203.

[27] Letter from David H. Stevens, Ass't Secretary of Housing – Federal Housing Commissioner (Oct. 8, 2010), available at http://portal.hud.gov/hudportal/documents/huddoc?id=OCT201008.pdf

[28] *Id*.

[29] *See generally* 24 C.F.R. § 203.605; Mortgagee Letter ("ML") 2000-05 ("Loss Mitigation Program-Comprehensive Clarification of Policy and Notice of Procedural Changes") (Jan. 19, 2000), available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs

[30] 4 C.F.R. § 203.500 et seq.; **Exhibit 27**, ML 2000-05 at p. 6; *see also* ML 2008-27 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008) to avoid treble damages, "First, mortgagees must ensure that the loss mitigation evaluations are completed for all delinquent mortgages before four full monthly installments are due and unpaid.  Second, mortgagees must ensure that the appropriate action is taken based on these evaluations. Third, mortgagees must maintain documentation of all initial and subsequent loss mitigation evaluations and actions taken;" available at

the basic and fundamental requirements related to the servicing of delinquent FHA loans under the mandated loss mitigation program. Generally, FHA-approved lenders (including Nationstar) are known as *Direct Endorsement Lenders*, and must, as part of the origination process, certify that loans meet strict underwriting criteria established by FHA, including property appraisals. *See* 24 C.F.R. § 203.5(c)-(e) (Direct Endorsement requirements for underwriter due diligence, mortgagor income evaluation and appraisal). The primary goal of the FHA program is to reduce the risk to lenders and encourage lending to borrowers, all the while increasing homeownership.

40.     The VA Home Loan Program was created to assist service members, veterans, reservists and certain surviving spouses in obtaining a home. 38 U.S.C. §§ 3701(b)(3), 3701(a), 3712. The VA provides a repayment guarantee to qualified lenders equal to a percentage of the loan if the borrower defaults. 38 U.S.C. §§ 3702(d), 3712(c)(2)-(3); 38 C.F.R. §§ 36.4202, 36.4225.

41.     Nationstar Mortgage improperly originated, endorsed and serviced FHA and VA loans by submitting erroneous appraisals that did not adhere to the strict appraisal requirements of the HUD and VA handbooks.

42.     Specifically, Nationstar violated the following regulations:

1.  **Appraisals must be conducted and reviewed by a state-certified appraiser with credentials based on the minimum certification criteria issued by the Appraiser Qualifications Board (AQB) of the Appraisal Foundation.**[31] The

---

http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs      (last      visited 7/27/2015).

[31] Section 202(f) of the National Housing Act mandates that all appraisers chosen or approved to conduct appraisals of properties that will be security for FHA-insured mortgages must: (1) be "certified" by the State in which the property to be appraised is located; *or* by a nationally recognized professional appraisal organization, *and* (2) have demonstrated verifiable education in the appraisal requirements established by FHA.  Similarly, appraisal reviewers must, in 43 states, be licensed in the state where the property is located

reviewing underwriters at Nationstar had little or no education and training concerning the real estate appraisal process or appraisal review process.

2. **Lenders are required to be familiar with, and to comply with, the current versions of governing FHA Handbooks and Mortgagee Letters, including the HUD Handbooks.** (*see* Handbook HUD-4150.2, Revised Appendix D – Valuation Protocol, dated January 2006; Handbook HUD-4155.2, Chapter 4, Property Valuation and Appraisals and HUD Mortgagee Letter 2005-06, Lender Accountability for Appraisals, dated January 28, 2005). Nationstar's underwriters were not complying with the current regulations as they relate to appraisals. [32]

3. **A lender must <u>certify</u> that it is in compliance with all HUD/FHA regulations, handbooks and policies.** Nationstar certified that it was in compliance; however, it did not follow the appraisal requirements as outlined in the HUD and VA Handbooks. Eighty-Nine (89) specific Appraisal Report categories were not accurately reported (*See* examples of improper appraisals attached as **Exhibits 4 and 5**; *see* also **Exhibit 6**, Chart of Multiple FHA Appraisal Report Violations Witnessed at Nationstar Mortgage (with yellow highlighted violations). *See* 24 C.F.R § 203.5(e)(3).[33]

4. **Direct Endorsement Lenders have a common law duty of due diligence, to act in good faith and refrain from taking advantage of the FHA by misrepresentation or lack of disclosure.** *See* 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983). Nationstar submitted inflated appraisals to the FHA for homes that were in default. In particular, there were numerous instances of short sales that did not complete, because of an overvalued, FHA-defective appraisal. This resulted in FHA providing a greater insurance (loss) pay out because of the inflated appraisal.

---

and the appraisal was done.  Nationstar pervasively violated this state law in reviewing appraisals on properties supporting loans in the 43 states. Each violation, some of which are criminal, is a separate violation of state law and thus an additional basis for demonstrating that the certifications of compliance are false.

[32] **Handbook HUD-4150.2**, Revised Appendix D – Valuation Protocol, dated January 2006, available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4150.2 (last visited 7/27/15); **Handbook HUD-4155.2**, Chapter 4, Property Valuation and Appraisals, available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4155.2 (last visited 7/27/15).

33 s*ee* also **VA Pamphlet 26-7**, Revised, Chapter 11, Appraisal Requirements) http://portal.hud.gov/hudportal/documents/huddoc?id=26-7c11VALH.pdf.

**Qui Tam Plaintiffs/Relators' Complaint**                                    26

5. **Direct Endorsement Lenders must maintain a Quality Control Program that complies with FHA requirements to ensure that all appraisal requirements are being met.** (*See* HUD Handbook 4150.2). Nationstar implemented ineffectual computer programs and outsourced to industry known, incompetent appraisal companies in a failed, pre-textual attempts to facially appear to be performing this requirement.

43.    The Consumer Protection Division in Maryland states that, "A crucial element of the endorsement process is the appraisal…[the] lender must have the property appraised to determine the maximum mortgage permitted for that property."[34] The effect of erroneous appraisals is detrimental to the livelihood of the long-standing FHA and VA programs, the borrowers and the taxpayers that fund the programs.  For instance, if Nationstar conveys title to a property after the borrower defaults, in exchange for payment of the mortgage insurance benefits, FHA and VA must also dedicate resources to the selling of the property in order to recover its insurance loss.  If the appraisal is accurate and properly prepared in compliance with HUD, the loss to FHA is minimal by the foreclosure on the property.  When an appraisal is inaccurate, or the appraiser was negligent, HUD's return on the sale of a foreclosed property that was overvalued could be significantly reduced, thereby increasing the loss to the FHA Insurance Fund.

44.    According to a January 28, 2005 letter to mortgagees, FHA Direct Endorsement mortgage lenders expressly accept responsibility for every appraisal report being submitted.[35] The lender has a non-delegable duty to ensure that violations do not occur.

A.    **Nationstar Violations of FHA and VA Appraisal Requirements - Origination**

45.    From as early as approximately 2009, acting as an FHA approved direct

---

[34] *Consumer Protection Division v. John Morgan, et al.*, 380 Md. 617, 846 A.2d 401 (2004).
[35] *See* HUD Mortgagee Letter 2005-06, Lender Accountability for Appraisals, dated January 28, 2005.

endorsement lender, Nationstar has endorsed and directly underwritten thousands of FHA guaranteed mortgages. Nationstar's underwriters who handle FHA and VA loan packages are **not** certified, licensed or trained appraisers.  Yet, management assigned the tasks of reviewing the appraisals for compliance to this untrained and unqualified staff.  Senior review appraisers on staff at Nationstar, on the other hand, are directed by management to review appraisals for **value**, only, **not** compliance.  However, in reviewing appraisals for value, the review appraisers have noticed the pervasive FHA/VA appraisal violations and reported the systemic appraisal problems directly to management.   The senior review appraisers have estimated that **95%** of the appraisals for FHA/VA, alone, are materially defective and do not comply with mandated FHA/VA requirements.

46.    Nationstar's defective appraisals could have been properly reviewed had management wanted to assign the compliance review to their certified and trained appraisal reviewers who were competent to review appraisals for FHA/VA compliance.   Notwithstanding the senior review appraiser's direct, repeated, disclosure of the defective appraisals and defective "underwriter review process" of the appraisals to management, management continued to assign the FHA/VA appraisal compliance review to **underwriters** who were uniquely **unqualified** in every respect. As a result, the virtual totality of FHA/VA appraisals has been defective, the defects have not been identified by the unqualified underwriters or anyone else, and the massive defects have never been corrected. To be clear, management was put on detailed notice of the system-wide defective appraisal process and the ineffective review of the process or the defective appraisals. Internal audits have confirmed the unlawful nature of Nationstar's FHA/VA appraisal requirements disregard.

## B.     Failure to Implement an FHA-Compliant Quality Control Program

47.     To service FHA loans, a servicer must have a fully functioning Quality Control (QC) Program in place to ensure that FHA-compliance procedures are observed and that personnel working for the lender understand how to meet the strict FHA requirements.[36] FHA-compliant QC programs and plans provide for the correction and reporting of problems and violations to HUD once the lender becomes aware of them.

48.     Nationstar knowingly failed to establish a compliant QC program for the FHA portfolio. Nationstar failed to (ii) assure compliance with FHAs and the mortgagees servicing requirements throughout its operations, (iii) protect the mortgagee and FHA from unacceptable risks, (iv) guard against errors, omissions and fraud, (v) assure swift and appropriate corrective

---

[36] *See* HUD Handbook No. 4060.1 Ch. 7: Quality Control Plan, available at
http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4060.1/40601c7HSGH.pdf *. e.g., inter alia:*

- § 7-1. FHA approved mortgagees must implement and continuously have in place a quality control plan for originating and/or servicing insured mortgages

- § 7-3, A. All quality control plans must be in writing and fully  functional from date of mortgagee's initial FHA approval

- § 7-3,B. Quality Control must be independent of originating and servicing functions; mortgagee is responsible for ensuring outside source performing quality control meets HUD requirements

- § 7-3,C. Mortgagees must properly train quality control staff, and provide them access to current guidelines in electronic or hard format

- § 7-3,D. Mortgagees must ensure quality control reviews are regular and timely, and completed within 90 days of closing loan.

- § 7-3, J. Quality control must ensure findings by employees or quality control staff are reported to HUD within 60 days of discovery.

- § 7-8, E. Quality control must verify escrow funds received are not used for other purposes and are maintained in separate account.

- § 7-11, C, D. Quality control must review for compliance with fair lending laws and transfer of servicing provisions in section 6 of RESPA.

action and (vi) notify finding of fraud or other serious violations to the HUD Homeownership

Center.[37] Nationstar **knowingly** failed to meet even the basic elements of a QC program.   A

properly implemented QC program would have pinpointed the defective appraisal reports that

were not in compliance with FHA and/or VA appraisal requirements and/or appraisals showing

inflated values and would have provided for a remedy.   Nationstar's QC program, however, has

been ineffective in dealing with FHA and VA appraisals, and the problem of defective FHA-

defective appraisals continues through the date of this disclosure.

49.     As recent as June 5, 2014, the appraisal review team was **not reviewing FHA

appraisal reports for compliance with FHA or VA appraisal requirements.** (It is important to

note that Nationstar's **first** internal manual utilized at that time titled "Procedures and Manuals:

03.02.005 Appraisal Requirements – first published: 03.22.2014 – last updated: 04.08.2014 – it is

an internal FHA appraisal requirements document for compliance review, originally created by a

Nationstar senior review appraiser in February 2014. That was the first Nationstar document that

actually disclosed and addressed FHA appraisal requirements for the review process).  Amazingly,

from 2009 through February 2014 there was no document or guideline for use by Nationstar's

compliance reviewers (underwriters) for evaluating compliance with FHA requirements. The

employees servicing the FHA portfolio did not have a check list, reference guide or instruction

manual to assist them in their determination of compliance with current FHA and VA appraisal

requirements, nor were they provided adequate instruction by management. Additionally,

employees have not completed the required training/education concerning the Uniform Standards

of Professional Appraisal Practice (USPAP), published by The Appraisal Foundation and

---

[37] *See* HUD Handbook, Quality Control Plan No. 4060.1 Ch. 7

**Qui Tam Plaintiffs/Relators' Complaint**                                                                                          **30**

authorized by the U.S Congress as the source of appraisal standards and appraiser qualifications.

50.     Instead, the Nationstar FHA underwriters have utilized a computer program to independently review and approve the bulk of appraisal reports being processed. This computer program is **profoundly lacking**, however, as it is only capable of reviewing the appraisal report for **objective items**, (e.g. square footage, site size, number of bedrooms, etc.). The computer program cannot review an appraisal report for **subjective compliance** items as **mandated** in current FHA and VA appraisal standards.[38] Subjective compliance items include review of photos, location maps and the appraiser's comments concerning the s**afety, security and soundness** of the dwelling. Nationstar's computer program <u>was not</u> an FHA or VA approved Quality Control platform.

51.     The servicer's knowing failure to implement an FHA compliant QC program was a direct violation of HUD requirements and rendered each of Nationstar's requests for payment from the FHA insurance fund a false claim. Thus, the initial and annual SPA certifications/representations executed by Nationstar, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for these additional reasons. These false certifications and representations were **express conditions of payment** and material to the government's decision to approve the SPAs and to the decision of making HAMP incentive payments.

C.     **Nationstar Violations of FHA Appraisal Requirements- Post-Default**

---

38 *See* Handbook HUD-4150.2, Revised Appendix D – Valuation Protocol, dated January 2006; Handbook HUD-4155.2, Chapter 4, Property Valuation and Appraisals; and VA Pamphlet 26-7, Revised, Chapter 11, Appraisal Requirements).

52.     Nationstar has knowingly taken ineffectual steps to improve the quality of FHA and VA home appraisals or to become compliant with FHA and VA appraisal requirements. One such step was implementing an automated valuation process called Valuation Production Services (VPS). Through the VPS system, Nationstar contracted with Collateral Intelligence (CI), a nationwide panel of appraisers with geographic competency in their respective market areas. Unfortunately, CI's appraisal reviews failed to meet HUD requirements and caused the **halting** of advantageous short sales due to unreasonably high market values being placed on properties by CI. If these short sales had been completed, the insurance loss to the FHA would have been **materially diminished**. The short sale of the home would have netted more money than a foreclosure and subsequent sale by FHA. On the other hand, Nationstar, knowingly, has been unjustly enriched by the improper appraisals.  Attached as **Exhibit 7** is a zip drive containing several examples of credible market value appraisals that were overridden with an unreasonably high market value being set by CI appraisers. After nearly 5 years (since approximately 2009) of false certifications, Nationstar reportedly began to take damage control measures to meet compliance standards.  Not until May of 2014, did Nationstar publish a guideline document on the company intranet titled "NSM FHA Appraisal Guide." Furthermore, Nationstar has only recently hired mortgage compliance specialists to attempt to establish compliance by Nationstar with mortgage lending and servicing regulations and requirements. Nonetheless, Nationstar continues to knowingly violate the FHA and VA appraisal requirements.

53.     Lastly, The FHA Home Affordable Modification Option (FHA HAMP) provides defaulting borrowers a loss mitigation solution that "combines a Loan Modification with a Partial Claim." The specific guidelines are found in a document released by HUD titled, "Making Home

Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option." It specifically requires that the FHA loan modification must be re-amortized to a 30-year fixed rate mortgage. Upon information and belief, Nationstar was modifying FHA loans and amortizing the loan for **more than 30 years which was prohibited**.

### D.      Examples of Nationstar's Inadequate Appraisals

**Exhibit 4**:      FHA Case #511-1179785
            Nationstar Mortgage Loan No:  223500183
            Property Address: 2484 El Cerrito Dr., Dallas, Texas 75228

54.      Deficiencies with the appraisal report per FHA Appraisal Requirements:

i.      In the *Improvements* section of the Uniform Residential Appraisal Report (URAR) form, the appraiser indicates there are not any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property.  After reading the structural engineers' report (pages 27-30) that is included in the appraisal report, the appraiser should have indicated that there are physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property and the appraiser should have provided an explanation addressing the nature of the deficiency and recommend repairs, alterations or required inspections, in the improvements section under physical deficiencies/adverse conditions.

**Requirement for Structural Conditions**
Appraiser must answer yes/no question on the appraisal addressing physical deficiencies affecting structural integrity. If answered "yes", provide an explanation addressing the nature of the deficiency and recommend repairs, alterations or required inspections, in the improvements section under physical deficiencies/adverse conditions. (HUD 4150.2, Revised Appendix D, Valuation Protocol, page D-4).

ii.      In the *Foundation* section of the URAR the appraiser does not indicate any evidence of settlement.  After reading the structural engineers' report (pages 27-30) that is included in the appraisal report, the appraiser should have indicated evidence of foundation settlement.

**Requirement for Foundation**
Report any evidence of dampness or settlement by noting such under the foundation section of improvements description.  Describe the nature of the deficiency and recommend repairs, alterations or required inspections, if any, in the improvements section under physical

deficiencies/adverse conditions. (HUD 4150.2, Revised Appendix D, Valuation Protocol, pages D-4 and D-5).

     iii.    The appraiser makes the appraisal "subject to" the repair of faucet area in the hall bath.  After reading the structural engineers' report, (pages 27-30) that is included in the appraisal report, the appraiser should also have made the appraisal "subject to" satisfactory replacement of the damaged west girder member located under the master bath toilet.

**Requirement for Reconciliation –** This appraisal is made "subject to a repairs or alterations". This appraisal is made "subject to repairs or alterations." When the appraisal involves existing housing, or new construction more than 90% complete with only buyer preference items remaining (floor coverings, appliances, landscaping packages (soil must be stabilized to prevent erosion),requiring repairs or alterations to:  Protect the health and safety of the occupants, Protect the security of the property, Correct physical deficiencies or conditions affecting structural integrity, Complete buyer preference items for new homes, or to Complete repairs/improvements noted in work order or contractor estimates for the Streamline K, Meet FHA Minimum Property Requirements.  The appraiser must indicate the extent of repairs and note this in the appropriate section of the appraisal, or in the "additional comments" section, or in an addendum, under the heading of "Reconciliation – Required Repairs" listing the repairs noted together with an estimated cost to cure.  (HUD 4150.2, Revised Appendix D, Valuation Protocol, pages D-33 and D-34).

     iv.    After reading the engineers' report (pages 27-30) that is included in the appraisal report, the appraiser should have included comments to disclose potential ponding of water next to the dwelling.  The appraiser should have made installation of gutters or downspouts or construction of appropriate grading or landscaping a repair requirement to divert the flow of water away from the foundation.

**Requirement for Grading and Drainage**
Check for readily observable evidence of grading and drainage problems. Proper drainage control measures may include gutters and downspouts or appropriate grading or landscaping to divert the flow of water away from the foundation. If the grading does not provide positive drainage from the improvements, make a repair requirement. Note any readily observable evidence of standing water near the property that indicates improper drainage. If the standing water is problematic, make a repair requirement in the site section of the report.  (HUD 4150.2, Revised Appendix D, Valuation Protocol, page D-4).

     v.    The following comment is found in the appraisal report:  "The dwelling will meet FHA and HUD's minimum property requirements for existing dwellings as outlined in the HUD handbooks 4150.2 and 4905.1 as soon as the bath plumbing in the wall is repaired".  After review of the engineers' report (see pages 27-30) that is included in the appraisal report, the appraiser should have made the appraisal "subject to a required inspection" to verify that all required repairs have been

satisfactorily completed.

**Requirement for Reconciliation** – This appraisal is made "subject to a required inspection". When the appraisal calls for a required inspection to: Certify the condition and/or status of a mechanical or structural element of the property, Protect the health and safety of the occupants, Protect the security of the property, Meet FHA Minimum Property Requirements or Minimum Property Standards. The appraiser must indicate the reasoning for any required inspections and note this in the appropriate section of the appraisal, or in the "additional comments" section, or in an addendum, under the heading of "Reconciliation – Required Inspection " listing the required inspections. The value "subject to completion per plans and specifications", "subject to the following repairs or alterations", or "subject to the following required inspection" must be consistent with the subject property condition(s) described.  More than one box may be marked in the reconciliation section depending on the assignment and property conditions. (HUD 4150.2, Revised Appendix D, Valuation Protocol, page D-34).

**Exhibit 5:**      FHA Case #137-7635370-703
             Nationstar Mortgage Loan No:  286220088
             Property Address:  226 S. Gladstone Ave., Aurora, IL 60506

   55.    Deficiencies with the appraisal report per FHA Appraisal Requirements:

   i.      The photo of the subject property's attic indicates limited and incomplete inspection of the attic.  The appraiser does not state that a head and shoulders inspection of the attic was performed.   The appraiser must have full access to all property improvements.  If the appraiser is unable to visually evaluate the improvements in their entirety, the appraiser must contact the lender and reschedule a time when a complete visual inspection can be performed.  The appraiser includes the following comment in the report: "With the head and shoulder inspection of the attic that was the best photo we could get of the attic at the time of inspection.  We have no additional/clearer photos of the scuttle or attic interior".

**Requirement for Attic**
Enter the attic and observe the interior roofing for insulation, deficient materials, leaks or readily observable evidence of significant water damage, structural problems, previous fire damage, FRT sheathing, exposed and frayed wiring and adequate ventilation by vent, fan or window. If any of these deficiencies exist, condition the appraisal on their repair and prepare the appraisal "subject to repairs" and/or "subject to inspection".  The attic must be entered, at a minimum, by head and shoulders, whether access is by pull-down stairway or scuttle. Size of the scuttle and accessibility of the attic dictate the level of entry. (HUD 4150.2, Revised Appendix D, Valuation Protocol, page D-22).

The physical condition of existing building improvements is examined at the time of the appraisal to determine whether repairs, alterations or inspections are necessary - essential to eliminate conditions threatening the continued physical security of the property.  Required

repairs will be limited to necessary requirements to: protect the health and safety of the occupants (**Safety**), protect the security of the property (**Security**), and correct physical deficiencies or conditions affecting structural integrity (**Soundness**).   A property with defective conditions is unacceptable until the defects or conditions have been remedied and the probability of further damage eliminated.  Defective conditions include:    defective construction; other readily observable conditions that impair the safety, sanitation or structural soundness of the dwelling.  Typical conditions that would require further inspection or testing by qualified individuals or entities:   infestation – evidence of termites; inoperative or inadequate plumbing, heating or electrical systems; structural failure in framing members; leaking or worn-out roofs; cracked masonry or foundation damage; drainage problems. Appraisers are reminded not to recommend inspections only as a means of limiting liability. The reason or indication of a particular problem must be given when requiring an inspection of any mechanical system, structural system, etc.  These guidelines are provided to assist in the examination of the property. To perform this analysis, the appraiser must have full access to all property improvements.  If unable to visually evaluate the improvements in their entirety, contact the lender and reschedule a time when a complete visual inspection can be performed. This includes access to the crawl space and attic.    (HUD 4150.2, Revised Appendix D, Valuation Protocol, pages D-2 and D-3).

     ii.      Photos in the report show evidence of peeling paint and exposed wood on the dwelling's exterior trim and peeling paint and exposed wood on the wood flooring in the screened porch.  The exterior photo of the subject's garage shows peeling paint and rotted wood at the base of the center column.  The subject dwelling is shown to have been constructed in 1937.  The appraisal should have been made "subject to" correction of all defective paint surfaces and "subject to" repair of the rotted wood.  In the physical deficiencies or adverse conditions section of the report, the appraiser should have entered an "X" in the Yes box and noted all areas affected.

For any home built prior to 1978, check for evidence of defective paint surfaces, including: peeling, scaling or chipping paint. For all FHA insured properties, correction is required to all defective paint surfaces in or on structures and/or property improvements built before January 1, 1978 in accordance with 24 CFR Part 35. Provide a detailed description and identify the exact location of any deficiency under "**physical deficiencies**" affecting livability.  If the appraiser observes defective paint in a home that was built before 1978, in the physical deficiencies or adverse conditions section of the appraisal report, the appraiser must enter an "X" in the "Yes" box, and note all areas affected. However, if the appraiser does not observe defective paint in a home that was built before 1978, an explanation is not required in the physical deficiencies or adverse conditions section of the appraisal report.  (HUD 4150.2, Revised Appendix D, Valuation Protocol, page D-6 and Mortgagee Letter 2010-17).

The physical condition of existing building improvements is examined at the time of the appraisal to determine whether repairs, alterations or inspections are necessary - essential to eliminate conditions threatening the continued physical security of the property.  Required

repairs will be limited to necessary requirements to:  protect the health and safety of the occupants (**Safety**), protect the security of the property (**Security**), and correct physical deficiencies or conditions affecting structural integrity (**Soundness**).   A property with defective conditions is unacceptable until the defects or conditions have been remedied and the probability of further damage eliminated. Defective conditions include:   defective construction, other readily observable conditions that impair the safety, sanitation or structural soundness of the dwelling. (HUD 4150.2, Revised Appendix D, Valuation Protocol, page D-2).

iii.      The photo showing the interior of the subject property's garage indicates a limited and incomplete inspection of the garage.  The photo appears to have been taken through a window.  Termite infestation could be the cause of the rotted wood shown at the base of the garage's exterior center column.  The appraisal should have been made "subject to" re-inspection when a complete visual inspection of the garage interior could be performed and possibly "subject to" further inspection or testing to determine termite infestation of the center column.

A property with defective conditions is unacceptable until the defects or conditions have been remedied and the probability of further damage eliminated. Defective conditions include: defective construction; other readily observable conditions that impair the safety, sanitation or structural soundness of the dwelling.  Typical conditions that would require further inspection or testing by qualified individuals or entities:  infestation – evidence of termites; inoperative or inadequate plumbing, heating or electrical systems; structural failure in framing members; leaking or worn-out roofs; cracked masonry or foundation damage; drainage problems. Appraisers are reminded not to recommend inspections only as a means of limiting liability. The reason or indication of a particular problem must be given when requiring an inspection of any mechanical system, structural system, etc.  These guidelines are provided to assist in the examination of the property. To perform this analysis, the appraiser must have full access to all property improvements.  If unable to visually evaluate the improvements in their entirety, contact the lender and reschedule a time when a complete visual inspection can be performed. (HUD 4150.2, Revised Appendix D, Valuation Protocol, pages D-2 and D-3).

### E.      Nationstar's False Certifications

56.      The FHA has paid insurance claims for insured mortgages based on Nationstar's false certifications, annually and transactionally, that it was in compliance with all FHA and HUD regulations.  These certifications were material to the government's decision to extend FHA insurance and to pay FHA mortgage insurance proceeds, and FHA would not have paid Nationstar

if it had known about Nationstar's false certifications and knowing failures to comply with FHA requirements.

57.     Specifically, in order to qualify as an FHA-insured lender, Nationstar was required to submit an annual certification to HUD.[39] Nationstar certified in its annual certification to HUD as follows (in sum and substance):

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

More specifically, the relevant, annual certification has been made by Nationstar annually from and after August 16, 2004, the date Nationstar was first approved to participate in HUD's Title I and Title II Programs and able to submit FHA mortgages for FHA insurance endorsement.[40]

58.     Nationstar is a participant in both the FHA Title I and Title II Programs, and therefore must submit the annual certification in question in order to maintain its approval.[41] In each annual certification, Nationstar certified that it had "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies,

---

[39] *See* 24 CFR § 202.5; *see also* ML 2009-42 ("Sub-Servicing of FHA-insured Mortgages") (Oct. 19, 2009), available at http://www.hud.gov/offices/adm/hudclips/letters/mortgagee/2009ml.cfm (last accessed November 12, 2014) ("As a reminder, the servicing of FHA-insured loans must be performed by a mortgagee that is approved by FHA pursuant to FHA guidelines. See 24 CFR §§202.5 and 203.502.").

[40] *See* http://www.hud.gov/ll/code/getllst.cfm?startseq=-1&called_by=llslcrit&ldrtp=05&lndrnme=Nationstar&lndrcity=&lndstate=all_states&lndrcounty=&lndrcountyCode=none&lndrzip=&ldrad=1&aafb=all_areas&groupsize=10&pbox1=on&pbox2=on&sobox1=on&sobox2=on&sobox3=on&sobox4=on&sobox5=on&sobox6=on.

and terms of any agreements entered into with the Department.[42] Absent such a certification, a lender cannot submit a mortgage for FHA insurance endorsement. The FHA has paid Nationstar insurance claims related to mortgages insured by the FHA based on the false certification that Nationstar had complied with all HUD-FHA regulations, including any servicing requirements. FHA would not have paid Nationstar for such mortgage insurance claims if it had known of Nationstar's false certifications and non-compliance and false certifications of compliance with HUD-FHA rules and regulations.

59.     Nationstar's cumulative FHA loss mitigation violations were material to the United States' decisions to approve the SPAs and to its (1) FHA insurance and (2) HAMP incentive payment decisions. Thus, the initial and annual SPA certifications/representations executed by Nationstar, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons.  Nationstar knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. 3729(a)(1)(A). Furthermore, Nationstar knowingly made, used or caused to be **made or used** a false record or statement material to a false or fraudulent claim that was material to the United States' decision to pay insurance claims for insured mortgages in violation of 31 U.S.C. § 3729(a)(1)(B). Nationstar's knowing false statements/certifications fraudulently induced the United States to make insurance claim payments from the FHA insurance fund, based upon the belief that Nationstar's certifications/representations

---

[42] *See* HUD Mortgagee Letter 2009-25 and the sample Annual Certification attached thereto, available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/letters/mortgagee/2009ml.

of compliance with all FHA and HUD regulations were true when they were, in fact, not true, all of which constituted additional bases for the False Claims Act violations recited herein. Therefore, Nationstar, in addition to FHA liability, is liable to the Government under the False Claims Act for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim under 31 U.S.C. §§ 3729(a)(1)(G).

## VIII. USPAP AND STATE APPRAISAL REQUIREMENTS

60.     Nationstar certified its compliance with, and covenanted that all services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes ordinances, codes and requirements and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.[43] The Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) requires that appraisers in federally related transactions comply with the Uniform Standards of Professional Appraisal Practice (USPAP).[44] The purpose of the USPAP is to promote and maintain a high level of public trust in appraisal practice by establishing requirements for appraisers.[45] "It is essential that appraisers develop and communicate their analyses, opinions and conclusion to

---

[43] Nationstar *Servicer Participation Agreement* (Exhibit 1) at Exhibit B, Financial Instrument at ¶5.b and Exhibit C, Form of Certification at ¶2.

[44] 12 U.S.C. 3339 and 12 U.S.C. 3350. FIERRA established a real estate appraiser regulatory system involving the Federal Government, the states and The Appraisal Foundation (TAF).

[45] USPAP is the quality control standards applicable for real property, personal property, intangibles and business valuation appraisal analysis and reports. The Appraisal Standards Board (ASB), one of two divisions of TAF, maintains USPAP and issues updates in January of even numbered years.  The other division of TAF, the Appraisal Qualifications Board (AQB) sets forth minimum qualifications for appraisal licensure, and its work has been adopted by all US states and territories. Title XI of FIERRA mandates that all state certified appraisers must meet the minimum education, experience and examination requirements promulgated by the AQB.  Attached at Exhibit 22 is a copy of the USPAP (2014-2015 Ed.).

intended users of their services in a manner that is meaningful and not misleading."[46] All State Appraiser Certification and Licensing Boards require compliance with USPAP. Each state has similar statutes governing appraiser certification and licensing that mandate that a certified/licensed appraiser must comply with USPAP. For example, the Texas Appraiser Licensing and Certification Board requires that in order to be a (i) State Licensed appraiser, (ii) Certified General appraiser or (iii) Certified Residential appraiser in Texas the appraiser must comply with USPAP.[47] In New York, explicit provisions from the USPAP are set forth as to how every appraisal assignment shall be conducted.[48] If a state-licensed or state-certified real estate appraiser does not employ "recognized methods or techniques" or does not comply with the general USPAP obligations to perform ethically and competently, the appraiser is in violation of state law, all of which has compounded Nationstar's number of state violations which further render its SPA certification and subsequent mandatory certifications of compliance false. These violations are in the multitudes of thousands as demonstrated herein.

61.    States require appraisal licensure for valuation work performed for federally related transactions and real estate related financial transactions when Federal law requires the services of such appraisers (categorized as M/FRT, Mandatory for Federally Related Transactions); however, thirty-eight (38) states (categorized as MAN, Mandatory) require appraisal licensure for any evaluation or appraisal service for which an opinion of value as defined by USPAP[49] is developed

---

[46] USPAP at U-5 (Preamble)
[47] See 22 TAC § 153.8, Scope of Practice, 22 TAC 155.1(a), incorporating USPAP. See also Tex. Occ. Code chapter. 1103.
[48] 19 NYCRR §1106.1 (2014)
[49] "An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship to a previous value opinion or numerical benchmark" USPAP at U-1 line 8-13.

whether Federally regulated or for other use. The third category of six states are voluntary states includes those where certified/licensed appraisers are not required for any appraisal/evaluation assignments. In addition, several states hold certified/licensed appraisers criminally liable for violating its appraisal regulations (Class A or B Misdemeanor).[50] For example, in the State of Connecticut a person could be subject to a penalty of $1000 or imprisonment or both for engaging in the real estate appraisal business without obtaining a certification, license, limited license or provisional license. Conn. Gen. Stat. §§ 20-523.

62.     Nationstar knowingly and improperly violated its requirement to comply with USPAP. Specifically, in order to comply with USPAP, an appraiser **must** meet the following obligations:

- An appraiser must act competently and in a manner that is independent, impartial and objective.

---

[50] It is a criminal offense (Class A or B Misdemeanor)  in the following states for a certified/licensure appraiser to violate the State's appraisal requirements (codified law provided for first five):
- Alabama (Ala. Admin. Code § 780-X-14-10 (1996))
- Alaska, (ALASKA STAT. § 08.87.100)
- Arizona,  (Ariz. Rev. State. § 32-3638)
- Connecticut, (Conn. Gen. Stat. § 20-523)
- Delaware, (Del. Code Ann. Title. 24, §§ 20-501, 20-523)
- Illinois,
- Kansas,
- Nevada
- New Hampshire
- New Mexico
- North Dakota
- Ohio
- Texas
- Utah
- Washington
- West Virginia
- Wyoming

- An appraiser must comply with the ETHICS RULE in all aspects of appraisal practice.

- An appraiser must maintain the data, information and analysis necessary to support his or her opinions for appraisal and appraisal review assignments in accordance with the RECORD KEEPING RULE.

- An appraiser must comply with the COMPETENCY RULE and the JURISDICITIONAL EXCEPTION RULE for all assignments.

- When an appraiser provides an opinion of value in an assignment, the appraiser must also comply with the SCOPE OF WORK RULE, the RECORD KEEPING RULE, the applicable development and reporting Standards and applicable Statements.

- When an appraiser proves an opinion about the quality of another appraiser's work that was performed as part of an appraisal or appraisal review assignment, the appraiser must also comply with the SCOPE OF WORK RULE, the RECORD KEEPING RULE, applicable portions of STANDARD 3 and applicable Statements.

- When preparing an appraisal or appraisal review that is a component of a larger assignment with additional opinions, conclusions, or recommendations, the appraisal or appraisal review component must comply with the applicable development and reporting Standards and applicable Statements, and the remaining component of the assignment must comply with the ETHICS RULE, the COMPENTENCY RULE, and the JURISDICTIONAL EXECPTION RULE.[51]

Upon information and belief, Nationstar failed, pervasively, to meet these obligations required under USPAP and therefore, was not compliant with USPAP and in turn violated state laws. Nationstar's course of conducted further demonstrates its participation in unfair, deceptive and abusive acts or practices.

   63.   Nationstar knowingly and improperly originated, endorsed and serviced loans that did not adhere to the appraisal requirements of each State. Upon information and belief, many,

---

[51] USPAP at U-5 – U-6 (lines188-215).

many mortgage loans and modifications serviced by Nationstar violated state law appraisal requirements, especially those requiring geographical competence for review appraisers and some primary appraisers.  For these additional reasons, Nationstar's certification/representations of compliance in its SPAs and each annual certification thereafter to the United States were false statements. Nationstar's false certifications fraudulently induced the United States to allow Nationstar to continue to provide services under its SPAs, and they were material to the United States' decisions to pay each false claim for payment submitted by Nationstar.

### IX. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES

64.    The Home Affordable Modification Program's instructions to servicers explicitly and prominently state that "Lenders MUST revise the [Home Affordable Modification Agreement] . . . as necessary to comply with applicable federal, state and local law."[52] Nationstar failed to make such required revisions. Any such failures to comply with state or local laws rendered false each of Nationstar's annual certifications, see *supra*, note 6, with all state and federal laws designed to protect consumers from unfair, discriminatory or predatory lending practices.

### A. UDAAP and UDAP

65.    The Dodd-Frank Act prohibits unfair, deceptive, or abusive acts or practices (UDAAP).  UDAAP is an extension of UDAP through Title X of the Dodd-Frank Act.  In addition, Section 5(a) ("unfair or deceptive acts or practices in or affecting commerce") of the FTC Act and

---

[52] Home Affordable Modification Agreement—Document Summary for non-GSE Loans (for use with Form 3157) (available at https://www.hmpadmin.com/portal/programs/hamp.jsp). This language reveals that the model HAMP forms establish a floor not a ceiling. In other words, Nationstar is not immunized from liability because it used the model forms. Rather, the HAMP instructions make clear that Nationstar was required to go beyond the requirements of the model forms if necessary to comply with federal, state and local law.

many state laws have contained broad prohibitions on unfair and deceptive acts and practices (UDAP) for many decades Others contain only specific prohibitions on clearly specified activities. And, some state laws exclude creditors from coverage.[53] Thus, the extent to which Nationstar violated state UDAP laws will vary based on the peculiarities of each state's law, but Nationstar did violate federal (UDAAP) and state (UDAP) laws, thus triggering FCA violations by falsely certifying compliance with those statutes.

66.    A number of the terms (and omitted terms) in the loan modification agreements raise potential UDAAP and UDAP violations:

- In the HAMP Loan Modification Agreements Nationstar did not provide the borrowers with the current principal balance of their loans prior to modification, which impeded their ability to make meaningful comparisons between their pre-modified principal balance and their adjusted, larger principal balances. This information could have been valuable in their evaluation whether to go through with the loan modifications. In addition, without this information, the borrowers could not determine whether Nationstar's representations of their new principal balance were correct. In the HAMP Loan Modification Agreements Nationstar failed to provide the borrowers with the current principal balance of their loans, which impeded their ability to make meaningful comparisons among their principal balance, their adjusted principal balances, and the payments they would have to make at maturity. This information could have been valuable in their evaluation whether to go through with the loan modifications. In addition, without this information, the borrowers could not determine whether Nationstar's representations of their principal balance were correct.

- Nationstar didn't break down the amounts it had advanced for unpaid and delinquent  interest, fees, escrow advances and other costs. These omissions prevented borrowers from ascertaining whether Nationstar's numbers were correct.

- Many of the modifications had interest rates that increased over time. It is a fair assumption that the lower initial interest rates were necessary for the loans to be affordable. If borrowers could not afford the loans at the higher, stepped up interest

---

[53] *See generally,* Carolyn L. Carter, <u>Consumer Protection in the States</u> (National Consumer Law Center, February 2009).

rates at the time of the modification, there is no reason to believe that they would be able to afford the higher interest rates in a few years.

- The modifications that Nationstar provided borrowers depended on home values rising to match the increased indebtedness on the home, such that it would be possible for the borrower to refinance when the step rate increased, or the borrowers' income increasing sufficiently to keep pace with the payment increases. These are the same misguided assumptions that lenders like Nationstar made a few years back and THAT led to the 2008 financial crisis that resulted in many people defaulting on their loans.

67.     Nationstar provided only temporary relief to borrowers, the effect of which was to postpone foreclosures, not to facilitate people keeping their homes. The loan modifications, with their deferred principle and balloon payments were not affordable in the long-term. By the maturity date of the modified loans, many borrowers will be elderly, having paid on their mortgages 30 years or more-and living on reduced, fixed retirement incomes, and thus be unable to obtain a loan to refinance their homes to pay off the balloon payments.  Even if they are not too old for lender services, many will likely have insufficient equity or income to refinance. <u>See <i>infra</i> at ¶¶ 200, 210, 217.</u> Thus, the initial and annual SPA certifications/representations executed by Nationstar, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. <u>These certifications were express conditions of payment and material to the government's decision to (1) approve the SPAs and (2)  make huge HAMP incentive payments.</u>

### B.  DODD-FRANK ACT

68.     The CFPB is still shaping the contours of Dodd-Frank's prohibitions on unfair, deceptive and abusive acts or practices, relying in large part on interpretations the FTC and the

courts have given to prohibitions on unfair or deceptive acts or practices under the FTC Act.[54]

69.     The Dodd-Frank Act[55] makes it:

unlawful for (1) any covered person or service provider--

(A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

(B) to engage in any unfair, deceptive, or abusive act or practice."[56]

70.     A covered person is "any person that engages in offering or providing a consumer financial product or service."[57] A consumer financial product or service includes extending credit.[58] Nationstar meets the definition of a covered person, and the loan modification agreements are consumer financial products, for the reasons previously discussed. From and after the enactment of Dodd-Frank through the present, Nationstar has regularly and systematically committed knowing violations of the Dodd-Frank Act in its servicing of borrowers' loan modifications.

### 1.  Unfair

71.     Unfairness is defined as an act or practice that:

(A)     . . . causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

(B)     such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[59]

---

[54] 15 U.S.C.A. § 45(a)(1) (2006).
[55] The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat., 1376-2223 (July 21, 2010).
[56] 12 U.S.C.A. § 5536(a)(1) (2010).
[57] 12 U.S.C.A. § 5481(6) (2010).
[58] 12 U.S.C.A. § 5481(5) and (15)(A)(1)(2010).
[59] 12 U.S.C.A. § § 5531(c)(1) (2010).

The unfairness provision further states that "in determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."[60]

72.     Applying these elements to the Nationstar loan modifications, the likelihood that borrowers will lose their homes at the end of the maturity periods or when their interest rates go up is a substantial injury.

73.     In its Supervision and Examination Manual, the CFPB has put some flesh on the second element-- that consumers are not reasonably able to avoid the injury. The critical inquiry is whether "material information about a product, such as pricing . . . is withheld until after the consumer has committed to purchasing the product. . . . The question is whether an act or practice hinders a consumer's decision-making. For example, not having access to important information could prevent consumers from comparing available alternatives, choosing those that are most desirable to them, and avoiding those that are inadequate or unsatisfactory."[61]

74.     The Nationstar modifications obscured and excluded material information about the loan modifications by excluding the amount of the deferred principal from the payment schedules, by not including the principal balance so the borrowers could meaningfully compare their options, by not providing borrowers with information from which they could assess the accuracy of Nationstar's figures, and by not making clear that Nationstar was under no obligation to refinance their balloon and deferred principal payments. These omissions impeded borrowers'

---

[60] 12 U.S.C.A. § § 5531(c)(2) (2010).
[61] CFPB Supervision and Examination Manual, version 2 (October 2012), p. UDAAP 2, citing the FTC Policy Statement on Deception (available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm).

ability to weigh their options with full information.[62]

75.     Obscuring the terms of the modifications does not benefit competition or consumers. To the extent that public policy is a consideration, numerous laws and judicial decisions have established that informed consumer choice is a value that the law should support.

### 2.  Deceptive

76.     Although the Dodd-Frank Act does not define the term deceptive, the CFPB Supervision and Examination Manual states that a representation or omission is deceptive if:

(1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

(2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

(3) the misleading representation, omission, act, or practice is material.[63]

77.     One feature of the loan modifications that falls under the deception prong is the omission of the deferred principal amounts from the payment schedules. Again, the CFPB Manual provides guidance: "Oral or fine print disclosures or contract disclosures may be insufficient to cure a misleading headline or a prominent written representation . . . . Acts or practices that may be deceptive include: making misleading cost or price claims."[64] The payment schedules are prominent in the loan modification agreements and give the impression that they reflect the true cost of the loan modifications even though the fine print indicates otherwise.

---

[62] See *infra* at ¶¶ 200, 210, 217.
[63] *Id.* at p. UDAAP 5.
[64] *Id.*

78.     The CFPB cites to the FTC's "four Ps" test for determining whether a statement is or is likely to be misleading. The test focuses on the prominence of the statement, whether the statement is presented in a format consumers can understand, whether the information is in a place consumers would look, and "whether the information is in close proximity to the claim it qualifies."[65] The critical language about the date for paying the deferred principal is not prominent nor is it in close proximity to the payment schedule, which it, in effect, qualifies.

79.     The focus of the second element takes into account the target audience. The question is: how would reasonable people who are financially distressed interpret the payment schedule? If "a significant minority" of such people would find the schedule misleading, this element is satisfied.[66]

80.     Finally, the last element is satisfied because deferred principal of tens and even hundreds of thousands of dollars is material to consumers' choices.

### 3.  Abusive

81.     An abusive act or practice is one that:

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of--

>   (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

>   (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

>   (C) the reasonable reliance by the consumer on a covered person to act in

---

[65] *Id*. at p. UDAAP 5-6.
[66] *Id* at 6.

the interests of the consumer.[67]

82.     Abusive acts and practices are not well-defined because abusive is a new addition to the traditional UDAP coverage. The CFPB has not yet provided any explicit guidance on the parameters of the prohibition. With that in mind, the same provisions and omissions that would support an unfairness claim would satisfy the first of the two categories of abusive acts and practices.

83.     Thus, the initial and annual SPA certifications/representations executed by Nationstar, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These certifications/representations were express conditions of payment and material to the government's decision to (1) execute the SPAs and (2) make HAMP incentive payments.

**C.  Nationstar's Unfair, Deceptive or Abusive Acts and Practices**

     **1.   Origination – Nationstar's Unlawful Cancellation of Loans**

84.     In August 2005, Relator Schimmelman joined Nationstar as a Loan Officer and progressed to Sales Manager in 2006, then Operations Manager in 2010.    In 2012, Relator Schimmelman was promoted to **AVP Operations**. His duties as AVP Operations included managing day to day production of consumer direct loan pipeline and the oversight of loan processing; from loan lock, underwriting, closing to funding. When a loan application is approved at origination it is moved into the underwriting pipeline for processing and decision.  After a loan

---

[67] 12 U.S.C.A. § § 5531(d) (2010).

receives a decision to fund, the loan cannot be cancelled by the lender without a specific cause that meets ECOA guidelines. However, Relator Schimmelman is aware that Nationstar unlawfully cancelled loans without good cause or legal right, and knowingly, falsely told borrowers it was because of title issues when, in fact, there was no title issue.

85.     Specifically, according to Relator Schimmelman, because Nationstar's warehouse [financial] lines were at capacity, approved loans weren't being funded by the required timelines and became aged. Not meeting funding timelines was a huge cost to Nationstar. Relator Schimmelman is aware that in January 2014, in an effort to rid negative revenue and backlogged loans from the pipeline, Nationstar intentionally **cancelled** approximately **2,200 loans** overnight. Nationstar EVP, Ramesh Lakshminaryan, EVP, John Hicks, and SVP, Todd Mcgowan, were involved in the decision to unlawfully cancel this group of loans.  Nationstar requested that the loans be turned down or cancelled by the end of the month and instructed its employees that "Title Incurable" be applied as reason for cancellation. Relator Schimmelman is aware these loans were all adverse action for title issue, when in fact there were **loans that had no title issue at all.**

86.  Nationstar knowingly told borrowers a **false reason for cancellation** when actually the borrowers were otherwise qualified to proceed.  According to Relator Schimmelman, the approximate 2,200 loans were at 180-400 days old from the application date with pending subordinations in process. The idle loans were costing Nationstar in "hedging fees." According to Relator, because of the circumstances it was more beneficial for Nationstar to cancel the loans, but because the loans had already been approved by underwriting, the loans were subject to ECOA and RESPA cancellation guidelines. Therefore, in addition, Nationstar was in violation of ECOA,

HMDA and RESPA timelines for cancelling the loans.[68]   Many borrowers were negatively impacted, because fees already paid in conjunction with the application were not reimbursed and interest rates locked at loan application were no longer available.   Some borrowers complained about the cancellation and were given reapplications, but many borrowers accepted Nationstar's false representations and suffered the consequences.

87.   On or about May 22, 2014, Relator Schimmelman met with SVP Operations, Andy Suhodolsky and SVP General Counsel, Jennifer Sager and two other Nationstar attorneys regarding his complaints over the 2,200 loans unlawfully cancelled.  However, nothing was done in response to correct the issue and Relator was told that things were "being handled."

## 2.   Selective Practice of Origination Fees Charged to Borrowers

88.   Nationstar's practice of charging lender origination fees to borrowers is unfair, deceptive and abusive. Relator Schimmelman is aware that Nationstar charges some borrowers lower origination, underwriting, and processing fees while other borrowers, with the same credit and loan structure, are charged higher fee amounts. Loan officers, Sales Manager, and Operations Managers have Nationstar's authority to waive lender origination fees. Sometimes this was done at borrower's request and other times waived in order to be able to fund the loan.  For instances, from November 2013 to January 2014, Relator is aware that senior management waived at closing any cash due from borrowers on most loans in an effort to get them all funded for the month.  This in turn benefited some borrowers while giving others unfair fee treatment.  This **selective practice**

---

68 When Lender suspends loan at conditional approval a Lender must cancel loan within 30 days, any cancellation outside 30 days it must meet the requirements to be valid.   In addition, Nationstar was submitting **false reporting to Fannie Mae and Freddie Mac** for HMDA coding of the reason for the decline of the approximate 2,200 loans.

is not only unfair and deceptive it is a violation of fair lending laws.[69]   Relator approached upper management regarding the unfair practice regarding charges applied to borrowers and was told not to worry about how Nationstar assessed lender origination fees.

### 3.      Nationstar Deceptively Priced Loans & Inflated Sales

89.     Nationstar deceptively priced loans from at least, on information and belief, as early as May 28, 2009.  Nationstar's practice, according to its FICO report(s), is to apply the highest FICO rather than the mid FICO and therefore the loan is securitized with an incorrect FICO pricing for that loan type. Borrowers who otherwise were not otherwise qualified for a loan using the mid FICO were pretextually qualified by the improper use of the higher FICO.

90.     Further, Relator Schimmelman is aware that in 2013, in an effort to inflate its 3rd & 4th Qtr sales reporting and secondary market hedging, Nationstar locked a large number of loans in sales to create the appearance of actual sales, when they were not. Nationstar management instructed employees to lock every loan they could touch.  This event **falsely inflated the *sales and in process* loan pipeline**. Because borrowers were **not** 100% approved, a majority of the loans were later **cancelled**.

### 4.  Nationstar Loss Mitigation Violations

91.     The Home Affordable Modification Program's instructions to servicers explicitly and prominently state that "Lenders **MUST** revise the [Home Affordable Modification Agreement] . . . as necessary to **comply with applicable federal, state and local law**."[70] The

---

69 See generally, *The Dodd-Frank Wall Street Reform and Consumer Protection Act*, Pub. L. 111-203, 124 Stat., 1376-2223 (July 21, 2010).
70 Home Affordable Modification Agreement—Document Summary for non-GSE Loans (for use with Form 3157) (available at https://www.hmpadmin.com/portal/programs/hamp.jsp at Borrower Documents tab). This language reveals that the model HAMP forms establish a floor not a ceiling. In other words, Nationstar

Dodd-Frank Act prohibits unfair, deceptive, or abusive acts or practices (UDAAP). In addition, some state laws contain broad prohibitions on unfair and deceptive acts and practices (UDAP). Others contain only specific prohibitions on clearly specified activities. And, some state laws actually exclude all or most lenders and creditors from coverage.[71] Thus, the extent to which Nationstar violated state UDAP laws will vary based on the peculiarities of each state's law. A number of the terms (and omitted terms) in the loan modification agreements raise potential UDAAP and UDAP violations as follows:

- In the HAMP Loan Modification Agreements Nationstar did not provide the borrowers with the current principal balance of their loans prior to modification, which impeded their ability to make meaningful comparisons between their pre-modified principal balance and their adjusted, larger principal balances. This information could have been valuable in their evaluation whether to go through with the loan modifications. In addition, without this information, the borrowers could not determine whether Nationstar's representations of their new principal balance were correct.

- Nationstar didn't break down the amounts it had advanced for unpaid and delinquent interest, fees, escrow advances and other costs. These omissions prevented borrowers from ascertaining whether Nationstar's numbers were correct.

- Many of the modifications had interest rates that increased over time. It is a fair assumption that the lower initial interest rates were necessary for the loans to be affordable. If borrowers could not afford the loans at the higher, stepped up interest rates at the time of the modification, there is no reason to believe that they would be able to afford the higher interest rates in a few years.

92.     The modifications that Nationstar provided borrowers depended on home values rising to match the increased indebtedness on the home, such that it would be possible for the

---

is not immunized from liability because it used the model forms. Rather, the HAMP instructions make clear that Nationstar had to go beyond the requirements of the model forms if necessary to comply with federal, state and local law.

[71] *See generally,* Carolyn L. Carter, Consumer Protection in the States, 14 (National Consumer Law Center, February 2009).

borrower to refinance when the step rate increased, *or* the borrowers' income increasing sufficiently to keep pace with the payment increases. These are the same misguided assumptions that lenders like Nationstar made a few years back and **THAT** led to the 2008 financial crisis that resulted in many people defaulting on their loans.

      93.    **Nationstar regularly engaged in the following loss mitigation violations,** from at least, on information and belief, as early as May 28, 2009, **all of which were unfair, abusive and deceptive**:

     a)  Inadequate staffing to accomplish goals of the programs (lack of training) Nationstar's failure to adequately staff and properly train its employees as required. In addition, Nationstar failed to hire experienced and qualified employees all of which compounded the lack of training. According to Relator Paris, training for SPOCs was only one day and not all employees hired by Nationstar had prior experience in loss mitigation.;

     b)  Improper performance of modification underwriting because of severe staffing problem;

     c)  Inadequate establishment of loan modification procedures;

     d)  Misplacement and failure to properly label and store loan modification documents. Relator is aware that many modification packages were simply lost due to lack of modification procedures;

     e)  Wrongful denial of modification applications without fair review and evaluations;

     f)  Imparting false/misleading information to borrowers regarding the status of loss mitigation review;

     g)  Not responding timely to borrower inquiries;

     h)  Improper calculations of borrowers' eligibility for loan modifications;

     i)  Wrongful denial of loan modifications when borrowers where otherwise qualified; and

j)   Improper processing of modification applications, leading to confusion of untrained staff and ultimate denial.

**D.   Loss Mitigation – Wrongful Delays and Denials**

94.   In addition to violations contained in the terms (and omitted terms) of the modification agreements, Nationstar's handling of the modification agreements, themselves, from at least, on information and belief, as early as May 28, 2009, amounted to unfair, deceptive and abusive acts and practices.

95.   Rather than assist borrowers who applied for modifications, employees in the loss mitigation department were often instructed by management to deny numerous modification requests <u>without a proper, fair and thorough review when the backlog became too congested</u>. Relator is aware that, Nationstar prepared and sent erroneous denial letters claiming the borrower failed to qualify or failed to meet time sensitive requests, all of which was untrue for these files. Nationstar knowingly and deceitfully failed to review the borrower's file for modification assistance, and, as a result, the borrowers were sent to foreclosure. Properly reviewing modification applications required resources that Nationstar did not commit. Because of severe understaffing, the volume of modification requests could not be evaluated according to program requirements, all at no fault of the borrowers. So, many borrowers lost the right to a modification for which they were otherwise qualified. Additionally, Nationstar did not have a review system in place for the staff to follow. It was less burdensome for the untrained and inexperienced employees to send borrowers, many of whom were in default or facing economic hardship, into foreclosure.[72]

---

[72] Relator is aware that Nationstar AVP Loss Mitigation (Jerome) from April 2013 to June 2014 was aware of this unlawful conduct. Complaints and concerns were further esculated to VP Phillip Montes (April 2013 to June 2014) but nothing was done to correct the ongoing problems.

Further, according to Relators, Nationstar engaged in tactics that would delay the modification application process by pretextually, repeatedly demanding borrowers (or their legal counsel) to submit the same documentation as many as six times over a period of 9 to 12 months. The violations were a product of Nationstar's **knowing** understaffing and untrained, inexperienced and unprepared employees. Many times loan modifications had all the documents necessary to complete a full HAMP review; however, Nationstar failed to do so and many borrowers were denied a modification due to pretextualy report of "missing" documents – which were often not missing, but were unreviewed due to lack of adequate staffing. This unfair, deceptive and abusive practice was known as applying a "soft reject," most of which were pre-textual, and caused the borrower, if not totally discourage, to start the entire application process over. In those situations where a borrower was in fact missing necessary documents, Relator Smith is aware that Nationstar often failed to send the Incomplete Information Notices to borrowers, as required under HAMP. [73] Consequently, many borrowers were wrongfully denied modifications, because of Nationstar's failures. Nationstar recognized that handling files in this manner would drive down "modification pipeline numbers," creating the pretextual appearance for the governing agencies that the files were being properly reviewed. Borrowers, who might otherwise have qualified, were wrongfully

---

[73] See MHA Handbook 4.4, at p. 97 ¶ 4.5. Under HAMP guidelines, when a borrower submits a loss mitigation application the servicer is required to inform the borrower, within 5 business days following receipt of any component of an application, whether their modification application is complete or incomplete – listing the additional document(s) and information requested. The date the borrower must remit the requested information/documents to complete the modification application must be no less than 30 calendar days from the date of the notice. Nationstar failed to "exercise reasonable diligence" in obtaining documents and information to complete a modification application before determining the borrower ineligible for HAMP.  *See* MHA Handbook 4.4, at p. 98 at ¶ 4.6.2

denied a modification without first receiving a full and fair review, as required, for all borrowers'
modification package.

96.    Similarly, virtually every client Relator Fisher assisted in seeking a modification
had experience with Nationstar's demands for **multiple submissions** of documents *previously
provided* to the servicer. The indifference demonstrated by Nationstar could not have been the
result of oversight, as Relator Fisher and the law firm he was assisting followed the document trail
each time and often failed to receive a sensible or rational response from Nationstar as to the delay.
Typically, Nationstar either claimed that the entire package was not received, or that the delay of
a decision had now taken so long that it required all new financial records in order render a final
decision on the modification. It was not uncommon for this scenario to play out more than once in
a single borrower's modification process (or attempted modification process), and each time
Nationstar requested new documentation, the entire process had to begin anew.

97.    For those borrowers who were enrolled in a trial period plan for HAMP or non-
HAMP modifications, this process, of making redundant demands for loan documentation already
submitted, was especially detrimental. When the final decision on whether to offer a loan
modification was eventually rendered, and the decision was a denial, after six to twelve months of
process harassment, and the borrower had performed the required trial payment plan, Nationstar
often demanded the immediate payment of all amounts past due – meaning the difference between
the lesser, modified trial payment amount and the full payment amount contained in the original
contract notwithstanding that the **borrowers had done exactly what they were required to do
to qualify for a modification**. This new debt, often equaling thousands of additional dollars, was
required to be paid within thirty (30) days or the borrower was forced into foreclosure, which

occurred with regularity.  Further, Nationstar often reported the lesser, modified trial payment to the credit reporting bureaus as not being made in full and on time, thereby harming the performing borrower's credit rating.  The adverse credit reports naturally destroyed any ability of the borrower to obtain other refinancing because of their damaged credit score.

98.     Additionally, Relator Smith is aware of many instances where borrowers were not sent a letter of HAMP approval for a modification. Unless the borrower called in to inquire about the status of their modification application, they would have no notice. Without any notice, borrowers would miss scheduled trial payments resulting in a denial, and often foreclosure because the foreclosure sale date was not been suspended (dual tracking violating federal and at least California, Nevada and Minnesota laws and regulations.

99.     These knowing violations were common and, as a result, numerous borrowers' homes were foreclosed upon because a modification package wasn't timely reviewed by Nationstar. Further, Nationstar compounded the problem by unlawfully failing to suspend foreclosure sale dates. Had Nationstar been properly **staffed** and **properly trained** its staff, as the servicer **expressly covenanted to the United States** in the Financial Instrument of the SPA, Nationstar could have avoided virtually all of the widespread violations attendant to the extreme loan modification pipeline processing problems.[74] The problems and the cure were known to all, but not implemented by management.

---

[74] *See* Exhibit 1, Nationstar SPA at Financial Instrument, p. 3 ¶ 5(d); Exhibit 2, Nationstar Amended and Restated SPA at Financial Instrument, p. B-3 ¶ 5(d).

### E.      Improper Allocation of Mortgage Payments

100.     Another significant course of conduct demonstrating Nationstar's unfair, deceptive and abusive practices was the improper posting of payments made by borrowers resulting in misallocated payments and the follow-on negative reports to the credit reporting agencies ("CRAs"), often forcing borrowers towards foreclosure.     RESPA requires that servicers of federally regulated loans must "take timely action to respond to a borrower's request to correct errors relating to allocation of payments…"[75] By not posting a payment in accordance with a borrower's request, Nationstar violated UDAAP and RESPA.

### F.      Unlawful, Forced Advance of Escrow

101.     Nationstar forced obligations upon borrowers in default or facing hardship who requested a modification wherein their original note did not require an escrow account as long as the borrower paid taxes and insurance under the terms of the note. When a borrower sought a modification (including HAMP), Nationstar would automatically modify the loan to require an escrow account. Borrowers who chose **not to accept** the modification would then remain under this "forced" escrow even though it was not included in their original loan. Borrowers were **not notified** that their loan had remained in a forced escrow. This even occurred in instances following a newly originated loan wherein the note did not require escrow, but Nationstar, disregarding the terms of the note and forced the loan to escrow whether or not the borrower was in default on insurance or taxes.76

---

[75] 12 USC § 2605(k)(1)(C)

76 Relator is aware that complaints and concerns regarding forced escrow were esculated to Sr. VP Tony Gallego (Customer Relations), but nothing was done to remedy the problems.

**Qui Tam Plaintiffs/Relators' Complaint**                                                      **61**

102.   Often, borrowers would suffer for months, even years, for Nationstar to fix its forced escrow errors, which caused a domino effect of different harms to the borrower.  As a result of the forced escrow account, the borrower's payment would be considered short, even though the borrower was making the same payment as required in the original note. The borrower's payment would then be placed in a suspense account but not applied to the mortgage due. This caused the borrower to become delinquent on each monthly mortgage loan payment, as part of each payment was set apart for escrow.   In addition, adding insult to injury, Nationstar issued negative credit reporting to CRAs for each delinquency cause by Nationstar.  At that point, the borrower (1) was considered to be several months in default, (2) their monthly payments had been placed in a suspense account, (3) they were accruing late charges monthly and (4) their "default" had been reported to the relevant credit bureaus, resulting in a negative hit to their credit report.

103.   This unfair, abusive and deceptive practice also directly violates rules issued by the CFPB which require more transparency by the servicer in the insurance process, specifically. Servicers generally must ensure that borrowers maintain property insurance.[77] If the borrower does not maintain an insurance plan, the servicer typically has the right to purchase such insurance on the borrower's behalf; however, the CFPB has placed restrictions on the servicers' purchase of "force-placed" insurance, so as not to surprise borrowers. Specifically, servicers must (1) include advance notice and pricing information before charging consumers for "force-placed" insurance; (2) have a reasonable basis for concluding that a borrower lacks such insurance before purchasing a new policy on the borrower's property; and (3) terminate the new "force-placed" policy within

---

[77] 12 C.F.R § 1024.37.

fifteen days and refund the premiums if they receive evidence that the policy was, in fact, not needed; *i.e.* the borrower had already purchased insurance on the property.[78] Despite the CFPB policy, Nationstar regularly violated this consumer protection provision, by failing to acknowledge the borrower's own purchase of insurance and failing to refund premiums advanced on a force-placed plan. Many customer complaints were to no avail.

104.    This unfair and abusive practice, of forcing unnecessary and improper escrow advances on borrowers, literally *forced some borrowers into delinquency*, and additionally rendered Nationstar's certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false** for these additional reasons. These certifications/representations were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### G.    "In-Flight" Modifications

105.    Commonly known in the industry as "In-Flight" modifications, these are loan modifications that are already in progress, and often actually approved by the transferring servicer, when the servicing rights of the loan are sold to another financial institution.  In these purchase transactions, Nationstar would receive only a portion of borrower's loan file, (i.e. the transferor commonly failed to transfer some of borrowers' documents to Nationstar). Therefore, when a borrower who believed he or she had been approved for modification by the transferor servicer would begin making the adjusted payments, the borrower's payment would be short as measured

---

[78] *Id.*

against the old higher payment, because the incomplete transferred file was incomplete and Nationstar had no record of the approved modification and adjusted payment, all of which was no fault of the borrower.  Nationstar, often, knowingly failed to confirm or honor the borrowers' report of prior modifications and failed to offer alternative options to save these borrowers' homes. This conduct wrongfully drove many borrowers, who otherwise qualified for relief, into foreclosure.

106.     Borrower's in-flight modifications were regularly not being honored by Nationstar, even though it was determined by the Nationstar CFPB Compliance Manager that the borrower should have been eligible for modification andelief should have been extended to the borrower to avoid foreclosure.[79] Consequently, if borrowers wanted a modification, they were usually required to re-start the entire modification with Nationstar, even if payments, interest rates and charges were higher. Relator Smith is further aware of some borrowers not qualifying for a modification with Nationstar, despite being approved by the prior servicer.  The lack of due diligence demonstrated by Nationstar is grossly unfair, deceptive and abusive to borrowers.  At times, borrowers lost their home to foreclosure, because borrowers weren't able to timely complete a modification prior to the sale date subsequent to Nationstar not honoring the in-flight modification while it dual tracked with the foreclosure process. Nationstar's knowing course of action caused "substantial injury to consumers" and violates the Dodd-Frank Act and UDAAP/UDAP provisions.

---

[79] In Fall 2013 a meeting was held by EVP, Dana Dillard in which the CFPB Compliance Manager was in attendance. The meeting centered around identifying compliance issues at Nationstar.  Interestingly, no agenda or meeting meetings were issued. Employees attending were instructed not to make any writings and lunch was catered. Upon information and belief, Nationstar intentionally requested that no written document regarding the discussions would be available.  Any proposed efforts by Nationstar to correct the ongoing violations were not part of the discussions.

### H.     Failure to suspend foreclosure process (Dual Tracking)

107.    Relator Paris is aware that Nationstar, regularly and knowingly failed to suspend foreclosure proceedings when a delinquent borrower's modification package was under review, in direct violation of CFPB as well as California, Nevada and Minnesota laws, regulations and rules. Specifically,

108.    The rule restricts "dual tracking," where a servicer is simultaneously evaluating a consumer for loan modifications or other alternatives at the same time that it prepares to foreclose on the property. Specifically, the rule prohibits a servicer from making the first notice or filing required for a foreclosure process until a mortgage loan account is more than 120 days delinquent. Even if a borrower is more than 120 days delinquent, if a borrower submits a complete application for a loss mitigation option before a servicer has made the first notice or filing required for a foreclosure process, a servicer may not start the foreclosure process unless (1) the servicer informs the borrower that the borrower is not eligible for any loss mitigation option (and any appeal has been exhausted), (2) a borrower rejects all loss mitigation offers, or (3) a borrower fails to comply with the terms of a loss mitigation option such as a trial modification.[80]

109.    Dual tracking results in many loans being erroneously forced into foreclosure when the borrowers would have otherwise qualified for some form of loss mitigation assistance. Nationstar knowingly, recklessly, indifferently or deliberately continued to process loan modifications while simultaneously pushing the foreclosure process.  According to Relator Smith, management at Nationstar instructed SPOCs not to communicate the sale date to the borrower and not to notate the sale date in the system. Without this information, borrowers were at the mercy of Nationstar, and at risk of losing their homes without a fighting chance to save it.

According to Ms. Smith, there were often instances where a borrower called in on perhaps a Friday to inquire about the status of borrower's application and as the SPOC she saw in the file that the

---

[80] *See* http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf; 12 C.F.R. 1024.41 (f)–(g).

**Qui Tam Plaintiffs/Relators' Complaint**                                          65

sale date was scheduled for Monday, but the borrower was still missing certain financials. The file did not indicate that a missing information letter had ever been sent to borrower. Relator Smith escalated these files, because of the critical sale date; but, her manager, Michael Smith, would respond that the foreclosure would not be suspended to assist the borrower. Ms. Smith stated this scenario occurred on approximately 30% of the files she reviewed and most borrowers' homes were ultimately lost to foreclosure. This practice was grossly unfair, deceptive and abusive in view of the fact that the borrower had usually complied with the obligations required for a modification, which was knowingly denied by Nationstar on fraudulent, pre-textual basis.

110.    The pervasive, knowing, unfair, abusive and deceptive violations under the Dodd-Frank Act, UDAAP, UDAP and CFPB laws, regulations, rules and requirements rendered Nationstar's [time relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices….", **knowingly false** for these additional reasons. These certifications were express conditions of payment and material to the government's decision to approve Nationstar's continuing participation in HAMP and to pay the false claims for incentive payments submitted by Nationstar.

### I.    Imparting False, Misleading Information to Borrowers

111.    In addition to all of the above alleged pretext, Nationstar employees, from at least, on information and belief, as early as May 28, 2009, often imparted false and misleading information to borrowers, resulting in wrongful denials of modification applications and borrowers' inability to receive loss mitigation assistance to which they were entitled under law.

112.     According to Relators, borrowers were falsely told that their modification packages were being reviewed and processed for modification, when they were not.  Relator Paris is aware that SPOCs would tell borrowers who called checking on the status of their modification that their application had not been yet been received when in fact the SPOC was aware the application was in the enourmous pipeline in limbo. Relator Paris observed other instances where borrowers were falsely told that not all required documentation for a modification had been received so their loan had not been submitted to underwriting. Many times, Nationstar actually possessed all the alleged missing documents.

113.     Additionally, Nationstar often requested redundant documentation (up to 3 or more times) from borrowers that it already possessed. Typically, Nationstar had the required documents in its possession for a long time without any review activity.  Nationstar covered up its knowing failure to review the pending modifications, within the regulatory requirements, by tendering borrowers with false and deceptive "aging" or "missing" document excuses for the modification delay.  According to Relator Smith, this happened on at least 50% of the files she handled.

114.     Often when borrowers called with questions regarding a denial or the terms or amounts reflected on their modification contract, employees [SPOCs] were instructed by management to tell borrowers that if they wanted an explanation borrower would have to appeal the modification, but never provided any direct answers.  Some borrowers would call with concerns regarding the escrow amount reflected on the final modification, but employees [SPOCs] were never trained on how to handle the escrow and would tell borrowers it wouldn't be corrected unless the borrowers executed the modification contract or appealed.

115.    This was obviously an unfair, deceptive, abusive and pre-textual excuse for denial of the borrower's modification application and rendered the initial and annual SPA certifications/representations executed by Nationstar, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false**.

### 1.   Wrongfully Advising Borrowers Not to Make Payments

116.    Relator Borse is aware that John Butler, SVP Sales at Nationstar wrongfully instructed his employees to advise borrowers not to make their payments and that they could "skip an extra payment" if they were refinancing.  However, when borrowers with Fannie, Freddie, FHA, HUD, and VA programs loan wouldn't make payments, as suggested by Nationstar reps, there would be a delay in funding and the borrowers would become delinquent and not qualify for the program. Relator  worked with Steve Lichti's, SVP of Customer Service, team and Alan Brodie, VP Customer Service, to attempt to correct borrower credit reporting and stave off collection calls, most of which resulted from Nationstar's improper conduct.

### J.    Manipulation of Modification Documents

117.    Upon information and belief, Nationstar regularly engaged in the unlawful, unilateral and knowing manipulation of borrowers' modification documents.  According to Relator Smith, there were instances where borrowers executed and returned what they believed to be the final modification and Nationstar manually changed the terms in its system after receipt, because of errors realized by Nationstar after the fact.  Rather than rescind the modification, Nationstar would attempt to manually manipulate the numbers to, *closely match* the terms signed by the borrowers, but it was impossible to match and the payment that the borrower believed was final

would change, and actual number were always higher.  Borrowers were not notified of the "new" payment amount and only became aware when the borrower called in to inquire about the modification.

118.    This event resulted in a snowball effect. Specifically, when the borrower sent in the monthly payment amount specified in the executed documents−for instance $1,200.00, but the actual (manipulated) payment in the system was $1,215−it was deemed "insufficient," because it did not match, exactly, the monthly payment contained in Nationstar's system. If the borrower was fortunate enough to have this "insufficient" payment returned, they might have discovered the payment discrepancy through a phone call to the servicer. However, if the "insufficient" payment was placed in a suspension account, as were most insufficient payments, the borrower had no idea that their payment had not been accepted and would likely not discover for several months. At that point, the borrower (1) was considered to be several months in default, (2) their monthly payments had been placed in a suspense account, (3) they were accruing late charges monthly and (4) their "default" had been reported to the credit bureau, resulting in a negative report to the credit bureaus. This unlawful knowing practice, of manipulating modification documents without notification to the borrower, is not only fraudulent, but unfair, deceptive and abusive to borrowers. Thus, the initial and annual SPA certifications/representations executed by Nationstar, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These knowingly false certifications/representations were express conditions of payment and material to the

government's decision to approve the SPAs and to continue to pay Nationstar's false claims for incentive payments under HAMP.

### K.        Bankruptcy Requirement Failures

119.       In December 2011, Rule 3002.1 of the Federal Rules of Bankruptcy Procedure went into effect, imposing new notice requirements on secured creditors in Chapter 13 bankruptcy cases. The rule applies to claims that are secured by a security interest in the debtor's principal residence, and which are provided for under 11 U.S.C § 1322(b)(5) of the Bankruptcy Code in the debtor's plan. Relator Borse is aware that from early 2012 through 2013 and upon information and belief since May 28, 2009, Nationstar failed to file Notice of Payment Change with respect to changes in the debtor's mortgage payment.  In addition, Nationstar was not correctly calculating payment changes for escrow or ARM calculations. Often, as a result borrowers would **become delinquent on their payments and motions for relief could not be filed by the borrowers.**

120.       Additionally, holders of secured claims on a Chapter 13 debtor's principal residence provided for under the debtors Plan pursuant to § 1322(b)(5) of the Bankruptcy Code shall file Notice of Fees, Expenses and Charges itemizing all such fees, expenses and charges incurred (a) after the debtor's case was filed, and (2) that the holder asserts are recoverable against the debtor or debtor's residence and shall be filed within 180 days after the date on which the fees, charges or expenses are incurred.  Relator Borse is aware that Nationstar failed to timely file the Notices of fees.  For this reason, fees were non-recoverable because they exceeded the 180 day mark.

X.     **GRAMM-LEACH-BLILEY ACT (GLB ACT), REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA), AND FAIR CREDIT REPORTING ACT FCRA**

A.     **GLB Act**

121.    The GLB Act, also known as the Financial Services Modernization Act of 1999, requires banks and other financial institutions to explain its information-sharing practices to customers and safeguard sensitive data. The Act authorizes agencies that regulate financial institutions (FTC, SEC, etc.) to put limits on how anyone that receives personal information from a financial institution may use or disclose the information. Section 501(b) specifically states:

> (b) Financial institution safeguards
>
> In furtherance of the policy in subsection (a) of this section, each agency or authority described in section 6805(a) of this title shall establish appropriate standards for the financial institutions subject to their jurisdiction relating to administrative, technical and physical safeguards—
>
>> (1) to insure the security and confidentiality of customer records and information;
>>
>> (2) to protect against any anticipated threats or hazards to the security or integrity of such records; and
>>
>> (3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.[81]

122.    Together, the agencies authorized by the GLB Act have created "**Interagency Guidelines Establishing Standards for Safeguarding Consumer Information**[82]" ("The Guidelines"). The Guidelines create common standards for financial institution security and

---

[81] 15 U.S. Code Section 6801(b).
[82] Federal Register Vol. 66, No. 22, February 1, 2001, pp. 8616-8641.

appoint the financial institution's board of directors as the primary body responsible for information security.  Section III (A) states that the non-delegable duty of the board or committee is to approve the bank's security policy, and "oversee the development, implementation and maintenance of the bank's information security program…"  Section III. F of the Guidelines requires the board to review the information security measures annually.

123.    Section III.C.1. of the Guidelines requires financial institutions to adopt the following measures to the extent that they are likely to protect customer information:

a.  Access controls on customer information systems;
b.  Access restrictions at physical locations customer information;
c.  Encryption of electronic customer information;
d.  Procedures to ensure that system modifications do not affect security;
e.  Dual control procedures, segregation of duties, and employee background checks;
f.  Monitoring systems to detect actual attacks on or intrusions into the customer information systems;
g.  Response programs that specify actions to be taken when unauthorized access has occurred; and
h.  Protection from physical destruction or damage to customer information.

124.    Nationstar knowingly engaged in reckless acts that violate the GLB Act, including the exchange of electronic mail containing personal information, including account numbers, loan numbers and social security numbers that were being sent to customers and third parties through unsecured networks on a daily basis. This practice is a clear violation of The Guidelines and compromises the security of Nationstar's customer's information. Nationstar's reckless disregard for the GLB Act provisions and the security of customers' confidential information poses an immediate risk of unauthorized third parties stealing personal information for fraudulent purposes. Nationstar's customers were unaware that unsecured transmittals were occurring and, in fact, trusted that Nationstar was adhering to all laws and regulations to keep their information secure.

125.     Despite specific notices of concern to Management on several occasions from April 2013 to June 2014 regarding Nationstar's violations of the GLB Act, including during management meetings attended by Vice President Ashley Reagan, Nationstar showed little interest in addressing the ongoing violations and it did not implement a policy for the protected transmission of borrowers' confidential information on a secure network

126.     The GLB Act **requires** the board of directors of a financial institution to institute procedures and guidelines for sending customer data through electronic means. It is the board's duty to ensure the privacy and protection of sensitive customer information.   Nationstar's board of directors knowingly neglected to fulfill their duty to the customer by ensuring that all customer information was securely sent electronically. Upon information and belief, these violations are still occurring.

127.     GLB Section 505 mandates that the agencies may enforce the GLB Act with the same sanctions that they use to regulate financial institutions. The FDIC may impose violations under Section 8 of the Federal Deposit Insurance Act, which allows the FDIC to impose penalties ranging from $5,000 per day up to $1,000,000. Sections 521 and 523 also provide enhanced criminal penalties for persons who gain fraudulent access to protected financial information.

**B.     RESPA**

128.     RESPA is a consumer protection statute that provides certain rights regarding the servicing of mortgage loans and escrow accounts.[83] Section 2605 states that prior to a loan transfer, it is the responsibility of the transferor servicer to notify the borrower in writing, fifteen (15) days

---

[83] 12 U.S.C. §§ 2601-2617.

before the effective date of the transfer.[84] The transferee receiving servicing rights to a loan must notify the borrower within fifteen (15) days after the effective date of the transfer of the servicing of the mortgage loan. [85]

129.     In addition, RESPA requires that a servicer of a federally related mortgage may not:

A.  obtain force-placed hazard insurance to maintain property insurance;
B.  charge fees for responding to valid qualified written requests under this section;
C.  fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties;
D.  fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan; or
E.  fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter.[86]

130.     Nationstar retained servicing rights in connection with certain business combinations and purchases of a competitor's loan portfolio. In turn, Nationstar was responsible for the timely notification of these transfers to the borrowers. Additionally, Nationstar was required to honor all modifications approved by the prior servicer. Nationstar regularly violated these requirements of federal law.

131.     Nationstar regularly remitted transferor/transferee letters to borrowers well past the statutorily required 15 days, thereby causing the innocent borrower to become late on a payment.[87]

---

[84] 12 U.S.C. § 2605(a) and § 2605(b)(1)-(2)(A).
[85] 12 U.S.C. § 2605(c)(1)-(2)(A)
[86] 12 U.S.C. § 2605(k)(1)(A)-(E)
[87] 12 U.S.C. § 2605(a)

The transfers were also carried out in such a way that many incomplete files were sent to the transferee, missing important documents, including the original mortgage contract or recently approved modification. Upon information and belief, Nationstar failed to timely respond to complaints regarding the misappropriation of mortgage payment funds when borrowers were not given credit for **payments made** during the transfer period.

### 1.      Untimely Transferee/Transferor Letters to Borrowers

132.    According to RESPA borrowers must receive notice of the transfer of their loan to a new servicer within fifteen (15) days to enable borrowers to avoid a delinquent payment and understand the appropriate contacts for servicing issues. Nationstar knowingly failed to timely transmit notices commonly known as "hello" letters to the borrowers in violation of RESPA.[88] Nationstar knowingly sent letters to borrowers up to 30 days after the transfer of servicing rights for the note. This confuses the borrower who then sends payment to the wrong servicer and becomes delinquent. Approximately 10% of borrowers received the required transferee letter untimely.

> If the transferor (rather than the transferee servicer that should properly receive payment on the loan) receives payment on or before the applicable due date (including any grace period allowed under the loan documents), a late fee may not be imposed on the borrower with respect to that payment.  Moreover, the payment may not be treated as late for any other purposes. 12 C.F.R. § 1024.21(d)(5)

In these instances, the borrower would send payment to the wrong servicer, due to the untimely transferee letter and Nationstar would improperly charge the unwitting borrower a late fee. This all occurred within the first 60 days of the transfer. Negative reports to CRAs also occurred to

---

[88] 12 U.S.C. § 2605(a)

innocent borrowers due to Nationstar's clear violations of the regulations, all of which was preventable.[89]

## 2.    RESPA Violations Pertaining to Applied Business Arrangements

133.    RESPA Section 8(c)(4) provides, in relevant part, that affiliated business arrangements are permitted so long as (1) a disclosure of the existence of the arrangement and a written estimate of the charges or range of charges made by the provider to which the consumer is referred is provided; (2) the consumer is not required to use the affiliated business; and (3) the only things of value received as a result of the arrangement is limited to a return on an ownership interest.[90]   RESPA further provides that the provider making each referral provide to each consumer a written disclosure in the format of the Affiliated Business Disclosures Statement set forth in Appendix D of 12 CFR Part 1024.[91]

134.    In 2013, Nationstar formed an affiliated business relationship with Solutionstar Settlement Services LLC and Solutionstar Settlement Services of Alabama LLC ("Solutionstar"), both of which are indirect wholly owned **subsidiaries** of Nationstar.  Immediately thereafter, Relator Schimmelman began to realize Nationstar's violations of Section 8 of RESPA.  Under RESPA providers must clearly disclosure to consumers that they are free to shop around for a better price and not required to use the affiliated entities' services.[92]   Nationstar's disclosures of affiliated businesses did not comply with the law.  Nationstar provided consumers its Affiliated Business Arrangement Disclosure Statement (ABA Disclosures) with inadequate and misleading

---

[89] Nationstar AVP Crystal Maddox was aware of the significant RESPA violations.
[90] 12 USC § 2607
[91] 12 CFR § 1024.15(b)
[92] RESPA 12 USC § 2607; 12 CFR 1024.32

disclosure language and failed to use the legally mandated format of Appendix D Part 2400 Affiliated Business Disclosure Statement.[93]   Nationstar's ABA Disclosures unlawfully omitted the required language of Appendix D.   Nationstar's ABA Disclosure form is attached hereto as **Exhibit 8**.   Specifically, the required Section A, notifying borrowers of their right to use other affiliated providers was **omitted**. The disclosure form required under RESPA, Appendix D, includes five components, including a block paragraph with the following language:

> You are NOT required to use the listed provider(s) as a condition for [settlement of your loan on] or] [purchase, sale, or refinance of the subject property. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

Relator is aware that Nationstar **knowingly omitted** the required disclosures so that consumers would not seek any other provider for services.   Nationstar explicitly directed title and closing services for which consumers would pay a charge to Solutionstar.   Nationstar violated Section 8(a) of RESPA by giving and receiving a thing of value pursuant to an agreement or understanding that Nationstar refer settlement services related to federally relating mortgage loans to Solutionstar by affirmatively influencing the selection

### 3.    Fraudulent Notice of Intent to Proceed

135.    Relator Schimmelman is aware that Nationstar's internal application Procedure and Policy implemented by loan originators is not in compliance with TILA and the Real Estate

---

93 12 CFR Part 1024 (formerly codified at 12 CFR Part 3400); also available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/ramh/res/resappd (last visited 6/17/2015);  24 CFR 3500.15(b)(1)

Settlement Protections Act - Regulation X (RESPA).  Under Section 3500.7 of Regulation X a lender (1) is prohibited from charging, as a condition for providing a Good Faith Estimate (GFE), any fee for an appraisal, inspection, or other similar settlement service; (2) may, at its option, charge a fee limited to the cost of a credit report; and (3) cannot charge additional fees until after the applicant has received the GFE and indicated an intention to proceed with the loan covered by that GFE.  A loan originator that violates the requirements under Section 3500.7 shall be deemed to have violated Section 5 of RESPA.[94]  In addition to the GFE, lenders are to provide consumers with a complete set of documents known as a RESPA package. Nationstar's application policy is to **unlawfully charge** the borrower for the **appraisal fee regardless** of whether borrower has provided the loan originator with a Notice of Intent to Proceed for the loan identified in the GFE.

136.    According to Relator Schimmelman, Nationstar's *Retail Appraisal Payment Procedure* dated July 20, 2012 provides Nationstar's policy to charge the applicant's appraisal fee by obtaining credit card details and automatically charging the appraisal fee the fourth day after delivering RESPA disclosures.[95] This protocol implemented by Nationstar violates RESPA because an unlawful presumption of a borrower's unexpressed intent is being made without borrower's actual intent communicated to Nationstar.  Additionally, upon information and belief Nationstar loan originators have **falsely executed** Certifications for RESPA compliance without applicant's notice of intent notwithstanding the foregoing RESPA violations about which management was on actual notice.

138.    In January 2014, Relator Schimmelman approached upper management regarding

---

[94] See 24 CFR 3500.7
[95] **Exhibit 9**, Nationstar Retail Appraisal Payment Procedure.

the on-going violations and need for the issue to be addressed. Mr. Pete Farley was assigned by Nationstar compliance department to look into the issue. Relator assisted Farley and Mary Moffatt with developing a resolution to bring Nationstar in compliance. Despite Nationstar's awareness of its deficiencies, the Procedure published May 28, 2014 (**Exhibit 10** at p. 25) reflected the same unlawful automatic appraisal fee charge on the fourth day.  On July 17, 2014, nearly **seven months after** Relator told management Nationstar was in violation of law, an Awareness Communication was internally distributed regarding an overview of properly obtaining borrower consent prior to charging appraisal or other fees.  However, according to Relator Schimmelman, there were **never any systematic changes** or changes to the published procedures and the **unlawful charges and fraudulent conduct** by Nationstar have **continued.**

### 4.      Additional Violations of RESPA

139.    Nationstar's course of conduct with regard to (1) "In-Flight Modifications" as described above at ¶¶ 105-106, and (2) improper allocations of mortgage payments as described above at ¶ 100 are both violations of RESPA. 12 U.S.C. § 1024.38.[96]

140.    A transferee servicer [Nationstar] must have policies and procedures reasonably designed to ensure, in connection with a servicing transfer, that the transferee servicer receives information regarding any loss mitigation discussions with a borrower, including any copies of loss mitigation agreements. Further, the transferee servicer's [Nationstar] policies and procedures must address obtaining any such missing information or documents from a transferor servicer before attempting to obtain such information from a borrower.[97] Nationstar knowingly failed to

---

[96] 12 USC § 2605(k)(1)(C)
[97] 12 U.S.C. § 1024.38(b)(4). See also Official Bureau Interpretations ¶ 38(b)(4)(ii) Compliance with the commentary issued by the BCFP affords protection from liability under § 19(b) of RESPA, 12 U.S.C.

have polices in place to assist in connection with a servicing transfer. This reckless act by Nationstar is a significant detriment to the borrower.

141.    Finally, payments received by Account Services are processed off-shore by a third party vendor and often misapplied to borrowers accounts.  Because the enormity of the problem, Nationstar posts an internal Weekly Dashboard for employees to focus on borrower complaints regarding misapplied payments.

142.    For      these      additional      reasons      Nationstar's      [time      relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false.** These false certifications/representations were express conditions of payment and material to the government's decision approve the SPAs and to pay the many false claims submitted by to make HAMP incentive payments.

### C.    FCRA

143.    The Fair Credit Reporting Act (FRCA), implemented by Regulation V, is designed to guarantee that information supplied to CRAs is accurate.[98] When a creditor reports information about a consumer, it has legal obligations under the FRCA's Furnisher Rule. When a furnisher (Nationstar) receives notice that a consumer disputes the accuracy and/or completeness of information provided to the CRA, the furnisher must investigate the disputed information. If the

---

2617(b)
[98] 15 U.S.C. § 1681 and 12 C.F.R. § 1022 (Regulation V)

furisher's investigation determines that the information was inaccurate or incomplete, it must notify **all** nationwide CRAs to which the information was furnished.[99]

### 1.    Inadequate Reporting to Credit Reporting Agencies (CRAs)

144.    Nationstar's internal credit reporting practice was to report negative credit information to all three CRAs (Experian, Equifax and TransUnion). If an error was found, however, it would only report the correct information to one CRA (Experian). This is yet another example of Nationstar's blatant disregard for the law.[100] This type of disregard has a negative impact on a consumer's financial state. It also goes against the spirit of the credit reporting system, which is to provide an accurate reading (high or low risk) of a person's financial condition to determine their interest rates for loans. The policy is clearly unfair, abusive and deceptive and, thus, violates federal and state laws as alleged above.

### 2.    False Reporting to CRAs

145.    Nationstar forced certain obligations upon borrowers which resulted in unfair, abusive and deceptive negative reports to CRAs. Specifically, Nationstar forced escrow upon borrowers which would result in the submission of improper, negative credit information to CRAs. It would take months, even years for Nationstar to resolve forced escrow issues. In some instances, a borrower's first payment would be considered delinquent.  Thus, the borrower would be in delinquent status and Nationstar in return improperly reported the borrower to the CRAs.  A

---

[99] 15 U.S.C. §1681s-2(b)(1)(D)

[100] *See* 15 U.S.C. § 1681s-2(a)(1)(A). (A servicer that furnishes information to consumer reporting agencies must establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information furnished considering applicable federal guidelines and must periodically review the policies and procedures and update them as necessary to ensure their continued effectiveness).

borrower who had worked hard to build good credit would not be able to recover from the wrongful credit reporting that resulted from Nationstar's knowing disregard of the law. . Even when the erroneous reports were corrected, Nationstar knowingly failed and refused to correct the reports with all three CRAs.  For these additional reasons, Nationstar's certifications/representations of compliance with federal and stated consumer lending laws were false and induced the United States to approved the SPAs and was material to the decision of the United States to pay Nationstar's numerous false claims submitted for HAMP incentive payments.

## XI.    NATIONSTAR DELAYED FUNDING  - LIQUIDITY ISSUES

146.    Relators Schimmelman and Borse are aware that, in 2013, Nationstar couldn't fund new loans (Fannie Mae, Freddie Mac, FHA, VA) or Ginnie Mae buyouts because Nationstar had no cash to do so.  Nationstar's warehouse lines[101] were at capacity and Nationstar didn't have sufficient cash to fund out of the operating accounts, which caused the business units to **completely stop funding loans.** At the time, Nationstar knowingly tied up all liquid cash in order to purchase additional servicing loans rather than to close loans for its borrowers.

147.    Relator Schimmelman is aware of funding was held for approximately 1,394 loans in September 2013 in the approximate amount of $238,825,878 as a result of inadequate funds to put up against its warehouse line to fund the loans. This was problematic, because **borrowers had already signed closing documents** on their loans, and Nationstar had agreed to the terms of the loans.  These 1,394 loans were not funding within the **3 days required** under federal and local requirements. This caused (1) per diem charges to borrowers for days of interest **they should not** have been **charged**; (2) **false reporting** to the credit bureau(s) for late payments due to the loan(s)

---

101 *http://en.wikipedia.org/wiki/Warehouse_line_of_credit*.

**not being funded timely**; and (3)  damage to borrowers for loss of locks, fees, loan qualification, and loss of funds paid to Nationstar.

148.    According to Relator Borse, the affected population of loans were given false closing and funding dates by management to cover-up the liquidity issues and it was virtually impossible to identify the affected population. Moreover, these loans were being sold to Fannie, Freddie, FHA, VA and other parties before the loans were funded as if the loans had been funded**.** Borrowers were also being falsely reported as delinquent to the credit bureaus because their old loan did not pay off in a timely manner when the new loans were not funded. Some borrowers were receiving collection calls on the old loans and default notices while others were stripped of their loan approvals and could no longer qualify for government-backed programs, all of which occurred at no fault of the borrowers.

149.    According to Relator Borse, management would choose the specific borrowers' loans that could be funded - giving preferential treatment to some borrowers over others. Sometimes the determinations were made by how much the borrowers were able to borrow on their loan amount, other times by the type of transaction (purchase money vs refinance), and other times by state where the property is located. Daily funding meetings were set up to determine how many loans could be funded that day and deal with loan-level issues that arose.  Examples of loan level unfairness and deception that resulted were:

- Duplicative loans on the system for one borrower or for one property;

- Funding a new loan without the borrower signing for it;

- Erasing all the borrowers loans from the systems of record; and

- Not charging the correct amount of interest and having the borrower be disqualified for the loan that they closed on because the loan wasn't funded in time and/or because the rate lock expired.

These meetings were held by SVP of Originations Processes, Michael Fisher[102] and administered by VP of Originations Processes, Brian Brown.[103]

150.     According to Relators, employees were instructed by Nationstar to falsely tell the agencies and the FHFA when asked that the funding delays were due to a **"technology *[IT]* glitch"** and that Nationstar had resolved the issue and that it would not happen again. Aside from very upper level management employees (CEO, COO, Chief Compliance Offer, EVPs, etc.) there were very few people in the company who knew that the **true reason** for lack of funding was a **liquidity issue**. [104]  Those people with actual knowledge were instructed by Michael Fisher, SVP that nothing was to be put in writing about the liquidity issue.

151.     In November 2013, onsite meetings were scheduled with Fannie Mae, Freddie Mac and the FHFA.[105]  Relator Borse was requested to attend the meeting with Freddie Mac and the FHFA to operate the slideshow and be available for questions.  Prior to the meeting Relator Borse was instructed by SVP of Originations Processes, Michael Fisher (who in turn had received the same instruction from John Hicks and Harold Lewis) to **falsely** inform and represent to the agencies and the FHFA that the funding delays were due to a "technology *[IT]* glitch" and that

---

[102] Not Michael J. Fisher that is a Relator in this suit.
[103]  **Exhibit 11a,** September 2013 Internal communications re Funding Delays**; Exhibits 11b-11c,** October 2013 Emails regarding potential impacts by funding delays.
[104] The NY loans affected by the purported "IT glitch" are part of the NYDFS and Lawsky investigation of Nationstar. (**Exhibit 13**, March 5, 2014 NYDFS letter to Nationstar).  However, only 141 of the 1,394 loans were New York loans whereby Nationstar failed to fund due to insufficient liquidity.  Upon information and belief, Nationstar has failed to take any steps to ensure that this situation does not recur.
[105] **Exhibit 12a,**  Freddie Mac Risk Evaluation Report; **Exhibit 12b,** October 21, 2013 Email regarding findings and what needs to be done to remediate issues; **Exhibit 12c,** November 15, 2013 Email by Michael Fisher regarding Action Plan and meeting agenda with Freddie Mac.

Nationstar had already resolved the issue and that it would not happen again.   Relator Borse

expressed her desire not to attend the meeting because she was uncomfortable with lying to the

Government agencies. However, Mr. Fisher instructed Relator to attend the meeting anyway.

Relator Borse is aware that at the meeting Harold Lewis and John Hicks **falsely** informed and

represented to the agencies and the FHFA that the funding delays were due to a "technology *[IT]*

glitch" and that Nationstar had already resolved the issue and that it would not happen again. In

addition to the meeting, Scott McIlhaney, SVP of Risk, prepared a written responses to the

Government which included the same lies.[106]

152.  Nationstar's conduct was clearly at odds with HUD guidelines for obtaining a lenders

certificate HUD-92900-A. Additionally, the Freddie Mac and its FHFA governing body clearly

state eligibility criteria (4.2), warranties and representations by seller (6.11), sale of mortgages free

of claims and liens (8.11) and fraud and suspicious activity (7.3) which NSM did not uphold nor

honor.

153.   Thus, the initial and annual SPA certifications/representations executed by

Nationstar, that it was "in compliance with all applicable Federal, state and local laws,

regulations…requirements…and other Federal and state laws designed to prevent unfair,

discriminatory or predatory lending practices…" were **knowingly false** for all of these additional

reasons. These certifications/representations were express conditions of payment and material to

the government's decision to approve the SPAs and its decision of whether to pay the numerous

false claims submitted by Nationstar for the HAMP incentive payments.

---

106 **Exhibit 14—**January 2014 Mcllhaney Email confirming technology excuse "communicated to
[Fannie Mae] Day 1."

## XII.   FRAUDULENT MANIPULATION OF AUDITS

154.   Relator Schimmelman is aware that Nationstar has been **manipulating the loan files** for **Government** and **investor audits, respectively.**   Freddie Mac requires servicers to provide 2,000 loans each month for audit review by the Agency.   According to Relator, on or about April 2015, Nationstar hired an offshore third party to assist in its fraudulent scheme of scrubbing loans files before providing them to the Government.   Nationstar selects and pulls the 2,000 loan files which are to be audited and then sent them offshore third partywhere they were reviewed and "prepared" for investor and agency audits. The third party essentially scrubs the loans to rid them of any errors or deficiencies that could raise a red flag during an audit. After the scrubbing, the loans are provided to the Government for audit. Upon information and belief, this practice is done for all loans subject to Government audits and not just Freddie loans. The pretextual scheme is detrimental to the United States and the borrowers and is material to the decision of the United States to pay incentive fees sought by Nationstar.

## XIII. STATE LAWS AND REGULATIONS

173.   Since Nationstar certified that it was in compliance with "all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," Exhibit 1, Nationstar *SPA***,** the following state laws are relevant to the falsity of OFC's initial certification to sell the financial instrument to Fannie Mae and each anniversary thereafter when re-certification was required.

174.   Nationstar has modified Texas home equity loans and purchase money mortgages

without, when required, complying with Tex. Const. Art. XVI, § 50(a)(6). Nationstar has added tens of thousands of dollars to the principal balance—**including the principal component of past due payments, which amounts were already part of the unpaid principal balance and were never loaned to the borrower—**far in excess of the original notes and of constitutional reasonable closing costs.[107] Similarly, Nationstar imposed new obligations, charging the borrowers interest on interest through the modification process, a burden not imposed by the terms of the original note or deed of trust. Nationstar pervasively violated many Texas constitutional and other legal requirements that protect homesteads in Texas. Those violations made false Nationstar's certification/representations of compliance with state [Texas] laws, regulations, rules and requirements in the SPAs, the Financial Instrument and the Annual Certifications each year thereafter false. The certifications/representations to the Fannie Mae were, a condition precedent of payment and fraudulently induce the United States to approve the SPA and execute the Financial Instrument.

175. New York Regulation 3 NYCRR § 419.11 states that Servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable**" for borrowers, and prevent foreclosure. Second, Servicers are required to provide borrowers with **<u>written disclosures</u>** that clearly state the **"material terms, costs and risks**."[108] As Nationstar pervasively violated both New York provisions, its certification of compliance with state [New York] laws and regulations in the initial SPA, and each year thereafter, constituted a false certification to the U.S.and (1) a

---

[107] 7 Tex. Admin. Code § 153.14(2)(B).

[108] 3 NYCRR 419.11(b) and (d).

fraudulent inducement of the United States to approve the SPAs and (2) false statements material

to the decision of whether the United States should pay the numerous false claims submitted by

Nationstar for HAMP incentive payments.

176.    The state of Massachusetts also has stringent requirements for Servicers. The Code

of Massachusetts' Regulations mandates that a third-party loan servicer may not use "**unfair or**

**unconscionable means**" when servicing a loan.[109] The Code also prohibits "misrepresenting any

material information [including] the amount, nature or terms of any fee or payment due…and

conditions of the servicing contract." 209 CMR § 18.21(1)(i). Massachusetts' law and regulations

also require that lenders provide borrowers with a Notice of the Right of Rescission which provides

the "obligor" a right to rescind a consumer credit transaction that involves an added security

interest in the principal dwelling of the person. Mass. Gen. Laws Ch. 140D § 10(b). Thus,

Nationstar pervasively violated the duty under Massachusetts law to provide borrowers the Notice

of the Right of Rescission at the time of loan modifications. For this additional reason the initial

and annual Nationstar Certifications of Compliance with federal and state [Massachusetts]

consumer lending laws under the SPA were false. Further, Nationstar pervasively violated these

Massachusetts laws protecting consumers. Those violations make Nationstar's certification of

compliance with state [Massachusetts] laws and regulations in the initial SPA, and each year

thereafter, a false certification and false statement to the United States made or used to fraudulently

induce the United States to approve the SPA.

177.    Pervasive violations by Nationstar make Nationstar's Certifications of Compliance

---

[109] 209 CMR § 18.21(1).

to Fannie Mae false, thus fraudulently inducing Fannie Mae to approve the SPA with Nationstar and approve the payment of huge incentives, all while Nationstar stood in violation of, at least, the following provisions:

### A. Texas Constitutional and Administrative Law

### 1. Constitutional Law

178. Nationstar has modified Texas home equity loans and purchase money mortgage loans by making "an advancement of new funds, or by increasing the obligations beyond those created by the original note and deed of trust" without complying with Tex. Const. Art. XVI, § 50(a)(6). Nationstar has at times, "when making new extensions of credit," added tens of thousands of dollars to the principal balance, including the unloaned principal sums (for (1) unloaned principal in the past-due-monthly payments and (2) escrow advances which had to be paid twice) , far in excess of (i) of the sums due and (ii) the obligations arising out of the original note or deed of trust which abridged the limits of constitutionally reasonable closing costs. 7. Tex. Admin. Code § 153.14(2)(B). Texas law provides that, if mortgage servicers increase the principal balance of existing loans (whether the original loan was for purchase money loan or a home equity loan) by new extension of credit not arising out of the original note or deed of trust the transaction constitutes a home equity loan under section 50(a)(6) as a matter of law, regardless of the parties' intent, and triggers a number of constitutional requirements and disclosures that protect the borrower's homestead. Nationstar often failed to abide by its duties to provide the protections of Section 50(a)(6) for Texas modifications when making borrowers "new extensions of credit" as defined by the Texas Supreme Court in the recent *Sims* case.[110] Thus, Nationstar's initial and

---

[110] *Sims, et al. v. Carrington Mortgage Services, LLC*, No. 13-068 Tex. Sup. Ct., (Tex. May 16, 2014).

annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **were knowingly false** for these additional reasons. These certifications were express conditions precedent for payment and material to the government's decision whether to make HAMP incentive payments to Nationstar.

179.    Loan modifications that increase the principal balance by capitalizing new extensions of credit such as unloaned principal from past due monthly payments, or escrow advances for which the borrower was not provided credit, seek to secure additional home equity and are thus home equity loans under Texas law. In addition, as outlined by the Texas Supreme Court in the *Sims* case in 2014, if there are "**new extensions of credit,**" Texas law unequivocally requires that when a lender advances such new  sums not arising out of the original note or deed of trust, to an existing home equity loan, it must satisfy **all the requirements** of Section 50(a)(6)(A) – (Q);— the requirements applicable to a home equity loan. If the "modification" does not comply with the long, demanding list of requirements at 50(a)(6)(A) – (Q), **no lien attaches** to the homestead. The lender has an unsecured, non-recourse loan unless and until it cures the loan within sixty (60) days of being notified by the borrower of the lender's failure to comply. *See* Tex. Const. Art. XVI, § 50(a)(6)(Q)(x). There is no other *safe harbor* for Texas home loan modifications which involve a *Sims* "**new extensions of credit,**" which is the only proper characterization for the capitalization of the **unloaned principal** component from past due monthly payments and escrow charges for which the borrower received not credit and had to pay twice. Given the predicate "**new extension of credit" under *Sims*,** Nationstar has violated numerous provisions of the Texas constitution Section 50(a)(6)-(Q). Thus, Nationstar's initial and

annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These certifications/representations were express conditions of payment and material to the government's decision whether to make the HAMP incentive payments to Nationstar.

180. Nationstar unlawfully *increased* the Texas borrowers' principal balances by making **new extensions of credi**t under *Sims*, including (1) the capitalization of **unloaned principal** from past due monthly payments and (2) the new financial burden of charging interest on interest (**not allowed** under the original note or deed of trust) and (3) capitalizing escrow advances for which the borrower was not given credit and had to pay twice at the end of the calendar year.
Subject to the *Sims* decision, the regulations state that "[t]he advance of additional funds to a borrower is not permitted by modification of an equity loan."[111] Equally important is the requirement that payments be an invariable monthly amount for the life of the loan. Principal was increased so much, however, that even with a lower interest rate, borrower payments increased and constituted an additional state law violation. To counteract this problem, Nationstar instituted modification terms involving interest-only payments and balloons, which created dramatic payment increases as the loan matured thus violations, Tex. Const. Art. XVI, § 50(a)(6)(L)(i). These laws clearly apply to the "**new extensions of credit,**" as clarified by *Sims*. as relating to obligations not arising out of the **original** note or deed of trust

181.   Furthermore, Nationstar failed to conform to Texas state law requirements pertaining to the modification of mortgage loans involving "new extensions of credit." Specifically, although Texas law requires it, in its Purchase Money Mortgage ("PMM")

---

[111] 7 Tex. Admin. Code § 153.14(2)(B).

modifications, Nationstar **<u>did not</u>**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment thus violations, **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company thus violating, **Tex. Const. Art. XVI, § 50(a)(6)(N).**

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6) thus violating, Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead with notice that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge thus violating, **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender thus violating, **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value of the home on the date the line of credit is established thus violating, **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

Thus, Nationstar's initial SPA, Financial Instrument and annual certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These certifications/representations were express conditions of payment and material to the government's decision to approve the SPAs and to its decision of whether to pay the numerous false claims submitted by Nationstar to obtain the HAMP incentive payments.

### 2. Sims "Extensions of Credit" Triggering Section 50(a)(6) Applications

182.    In a recent decision,[112] the Texas Supreme Court held that as long as there is no additional "extension of credit" in the modification of a home equity loan, the modification, or "restructuring," is valid and need not comply with the requirements of Tex. Const. Art. XVI, § 50(a)(6). The Court identified three situations, however, which constitute an "**extension of credit**" and make the loan modifications subject to the home equity provisions in Section 50(a)(6) of the Texas Constitution. The *Sims* case defined a new "extension of credit" as follows for purposes of home equity loan modifications:

1. A **re-financing** or "satisfaction or replacement" of the **original** note;"

2. An **advancement of new funds** which were not due and owing under the terms of the **original** note or deed of trust; and

3. The borrower has **new/increased obligations**, as a result of the modification, which were not created by the terms of the **original** note or deed of trust.

---

[112] *Sims, et al. v. Carrington Mortgage Services, LLC*, No. 13-068 Tex. Sup. Ct., (Tex. May 16, 2014). There is no reason to believe that the Supreme Court would rule differently in regards to purchase money mortgage modifications.

183.    The *Sims* opinion made evident that in a home equity loan modification, capitalizing any funds for obligations that grew out of the original mortgage contract/Deed of Trust, may be done without regard to Texas Section 50(a)(6) home equity provisions. However, if within the modification contract, any new funds are advanced for an obligation that **did not arise** from rights granted to the lender/servicer under the **original** note/Deed of Trust, **those advances of new funds [e.g., unloaned principal component or uncredited escrow advances required to be paid twice] implicate** Section 50(a)(6). Similarly, the same is true if the lender imposes **increased or new obligations** which do not arise out of the original (i)  note or (ii) deed of trust. Both of the foregoing events are considered new "extensions of credit" and are subject to the home equity provisions of Section 50(a)(6), which **includes** the requirement that the lender provide the borrower the notice of the right of rescission. Nationstar **never provided the notice of the right of rescission to a borrower even when required** under TILA/Reg. Z, Texas law or Massachusetts laws, respectively. Because Nationstar never provided the required notice of the right of rescission, Nationstar's initial SPA, Financial Instrument and annual certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications/representations were express conditions of payment and material to the government's decision whether to make HAMP incentive payments.  Moreover, Fannie Mae was fraudulently induced to execute the SPAs and Financial Instrument with Nationstar, and thus all Nationstar's claims submitted for HAMP incentive payments were false claims    184.    Upon information and belief, Nationstar has increased Texas borrower obligations by:

- Adding modification fees and costs including but not limited to ancillary costs (*e.g.,* charges for Broker Price Opinions, property inspections, appraisals, etc.) not arising out of the **original** note or deed of trust.

- Imposing interest on interest not allowed under the **original** note or deed of trust;

- Requiring the establishment of an escrow account that was not required by the terms of the **original** note/deed of trust;

- Extending the repayment period with only partial amortization creating large balloon payments due at the maturity of the modified note; and

- Capitalizing unloaned principal by capitalizing the entirety of the past due monthly payments, including the **unloaned principal and uncredited escrow advances which the borrower had to pay twice.**

185.    The situation outlined below occurs in many modifications and was not restricted to Texas, but would violate both the TILA/Reg. Z Right of Rescission duties under Federal law, as well as the Right of Rescission duties which arise pursuant to state laws (Massachusetts and Texas).

### 3.      The Relevant Situation

186.    When a borrower enters into a Note/Deed of Trust for a residential mortgage loan there are two methods by which to pay their property taxes and insurance premiums. Insurance premiums are always paid in advance, monthly, quarterly or annually. The escrow provisions for insurance or taxes are fact specific to each particular note and/or deed of trust. There are no generalizations that apply broadly to all mortgage contracts/security agreements. With this in mind, the following transactions would constitute a new obligation imposed by Nationstar on the borrower which would require Nationstar's compliance with Texas Constitution Section 50(a)(6) home equity provisions.

1. Borrower enters into an original purchase money note/deed of trust and the contract often **does not** expressly require that the borrower must maintain an impound/escrow account with the lender, and the borrower may elect to pay their insurance premiums and/or property taxes directly to the county/insurance company; and

2. Borrower then later enters into a modification contract wherein a condition of approval of the modification **requires the borrower to establish an escrow** account with the servicer/lender for the escrow of funds to pay annual taxes and insurance premiums.

Because the imposition by Nationstar of an escrow account was not required by the terms of the original note/deed of trust, the imposition of the escrow arrangement in the modification of the loan constituted a **new obligation,** thus triggering lender compliance with Texas' Section 50(a)(6) home equity provisions.

187.    Additionally, on some modifications, both HAMP and non-HAMP, the servicer is advancing/loaning new funds for Modification fees, expenses and costs that do not arise out of the original note or deed of trust. While *Sims* allows the capitalization of past due items arising from the original note and/or deed of trust, the prospective, post-modification imposition for the charging of interest on interest on any (i) capitalized, unloaned principal reflected in past due monthly payments, or the uncredited escrow advances that had to be paid twice, (ii) capitalized past due interest, (iii) capitalized property taxes and insurance premiums; (iv) prospective, not yet due escrow items and (v) reserve amount required by the servicer were new obligations that **would not have been allowed** without the borrower's approval in writing of the loan modification agreement. In particular, **the borrowers never approved the capitalization of unloaned principal** or the uncredited escrow advances that had to be paid twice. The HAMP agreements expressly provide:

> [Borrowers] understand that interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

188.    It is only by the express wording of the modification contract that interest is charged by the lender on these newly capitalized amounts; the original note and/or deed of trust did not allow this on capitalized interest on interest charge. Therefore, the charging of interest against the new capital advanced **[e.g., unloaned principal or uncredited escrow advances], is a new obligation** imposed on the borrower by the modification, thus triggering Texas Section 50(a)(6) home equity requirements.

189.    Additionally, Nationstar in its modifications of Home Equity Loans and Purchase Money Mortgages, although required by Texas law, made new extensions of credit and **did not**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment. **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company**. Tex. Const. Art. XVI, § 50(a)(6)(N).**

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6). Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead notice that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value of the home on the date the line of credit is established. **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

For these additional reasons, Nationstar's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications/representations were express conditions of payment and material to the government's decision to approve the SPAs and whether to pay the numerous false claims submitted by Nationstar to obtain the HAMP incentive payments.

### 4.    <u>Pervasive Violations by Purchase Money Mortgage Modifications</u>

190.    From and after Nationstar's execution of the SPA under the HAMP program, Nationstar's loan modifications of purchase money mortgages in the State of Texas virtually always involved adding the *Sims* **"new extensions of credit,"** **including the unloaned principal and uncredited escrow advances that had to be paid twice,** not arising from the **original** note

or deed of trust. As such, the transactions constituted home equity loans as a matter of law. According to Texas law post-*Sims*, Texas permits modifications of purchase money mortgages, except for those involving "new extensions of credit;" modified loans involving new extensions of credit are considered home equity loans invoking the protections of section 50(a)(6) of the Texas Constitution.

191.     Since virtually all purchase money mortgage modifications by Nationstar involved the ***Sims* "new extension of credit**," the modifications were home equity loans under Texas law, and Nationstar was required to comply with all of the provisions of Section 50(a)(6)A-Q, which Nationstar knowingly failed to do. Nationstar violated virtually all of the Texas Constitutional provisions as set out here and below on its purported purchase money mortgage modifications. Thus, Nationstar's initial and annual certifications/representations that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **were knowingly false** for all of these additional reasons. These certifications/representations were express conditions of payment and material to the government's decision to approve the SPAs and whether to pay the numerous false claims submitted by Nationstar to obtain the HAMP incentive payments.

### 5.     Loan-to-value Ratio

192.     In addition, Nationstar violates the Texas Constitution by collateralizing the new extensions of credit in contravention of Tex. Const. Art. XVI, § 50(a)(6). To comply with Section 50(a)(6), a new loan/modification which involves a new extension of credit must be completed without violating the strict 80% loan-to-value restriction. Tex. Const. Art. XVI, § 50(a)(6)(B).

Virtually all of Nationstar's Texas loan modifications violated Texas' 80% loan-to-value restriction as a result of the severe drop in Texas property values during the 2008 national financial crisis and the amounts advanced by Nationstar. This violation further renders Nationstar's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false.** These certifications were express conditions of payment and material to the government's decision whether make HAMP incentive payments.

### 6.    <u>Closing Location</u>

193.    In addition, the Texas constitution requires home equity loans involving **new extensions of credit** to close *in person* and **only at the office of a lender, attorney or title company**. Tex. Const. Article XVI § 50a(6)(N). All of Nationstar's mortgage modifications unlawfully **closed** by the borrower executing the documents and sending them to Nationstar by mail, Federal Express, or other carrier for finalization. The Texas Supreme Court has definitively ruled that the borrower, himself/herself, must attend all closing activities in one of the constitutionally permitted venues of an office of the lender, an attorney or title company, only. *The Financial Committee of Texas, et al. v. Valerie Norwood, et al.*, No. 10-0121, (Tex. Sup. Ct. Jan. 24, 2014). Nationstar did not comply with this Texas Constitutional requirement, nor many of the other Section 50(a)(6) requirements. Therefore, Nationstar's initial and annual certifications/representations in its SPAs, Financial Instrument and annual Certifications, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair,

discriminatory or predatory lending practices…" **were knowingly false**. These certifications/representations were express conditions of payment and material to whether the government's decision to approve to make  HAMP incentive payments.  Similarly, the facts constituted a fraudulent inducement of Fannie Mae to execute the SPAs and the Financial Instrument and rendered all Nationstar claims for HAMP incentive payments to be False Claims

### 7.   Texas Notice of Right of Rescission

194.    One of the requirements for home equity loans involving new extensions of credit under the Texas Constitution, like Section 1026.23(a) of Regulation Z, is that the servicer/lender must provide the borrower(s) with the mandated **Notice of the three (3) day Right of Rescission**.[113] As evident in **Exhibit 4**, the mandated Notices were not provided under either the federal or state laws. The owner of a homestead in Texas may, within three days after an extension of credit secured by his or her homestead is made, rescind the transaction without penalty or charge.[114] The Texas law is, therefore, similar to TILA's Regulation Z, which states that, in any transaction subject to rescission, the creditor must give the consumer the required written Notice of Right to Rescind. 12 C.F.R. § 1026.23(a)-(b). In Relator Fisher's experience and based on the documents they directly reviewed, virtually all of Nationstar's Texas modification contracts do not include either the required federal or Texas three day Notice of the Right of Rescission. The absence of these Notices of the Right of Rescission were additional violations of state law, rendering Nationstar's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and

---

[113] Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).

[114] Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).

other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false**. These certifications/representations were express conditions of payment and material to the government's decision whether make HAMP incentive payments to Nationstar.

### 8.  Full Amortization

195.    The Texas Constitution, interpreted by *Sims*, states that home equity loans involving the *Sims* **"new extensions of credit**" must be fully amortizing at inception and must remain that way. Home equity loans must provide for equal payments over the course of the loan, must pay down principal with each installment, and must be fully amortizing (*i.e.*, a steadily downward sloping principal curve that is zero at maturity). Tex. Const. Art. XVI, § 50(a)(6)(L) and 7 Tex. Admin. Code § 153.11. As the evidence demonstrates, Nationstar loan modifications violated these provisions. Thus, Nationstar's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications were **express conditions of payment** and material to the government's decision to approve the SPAs and whether to pay the numerous false claims submitted by Nationstar to obtain the HAMP incentive payments.

196.    In short, § 50(a)(6)(L) requires that affected loans:

1.  Have a definite **non-balloon** pay-off date;

2.  Pay down principal with every installment (7 Tex. Admin. Code Sec. 153.11); and

3.   Be **fully** amortizing.

The Texas Department of Banking and other state regulatory agencies state that:

> Section 50(a)(6) does not specifically allow or even mention modifications of home equity loans. Elsewhere, the constitution provides that a refinance secured by the homestead, any portion of which is a home equity loan, may not be secured by a valid lien against the homestead **unless the refinance of the debt is a home equity loan.** (citing Tex. Const. art. XVI, §50(f)).

Tex. Jt. Fin. Reg. Agencies, "Home Equity Modification Interpretation Letter," (Dec. 20, 2001).

Further, Relator has further obtained a letter from Nationstar denying borrowers a HAMP loan, or other modification, by stating that **Texas law forbids such modifications**. This letter demonstrates Nationstar's actual knowledge of the laws in Texas that protect homeowners. Nonetheless, the evidence proves that Nationstar knowingly made unlawful loan modifications in the State of Texas. In the letter dated February 26, 2013, Nationstar declines to modify Gregory Graze's mortgage loan, stating that:

> "…your loan originated as a Texas Home Equity, resulting in the extension of credit. In accordance with the Constitution of the State of Texas, modifications which increase the unpaid principal balance and/or extend the loan term are prohibited…**a loan modification under the Homes Affordable Modification Program (HAMP)…cannot be offered**…Effective July 2012 Nationstar <u>ceased validating</u> any delegated loan modifications on Texas Home Equity loans." *See* **Exhibit 18.**

Nonetheless, there is objective evidence that Nationstar made illegal loan modifications. Nationstar was unlawfully modifying Texas loans even though it clearly knew, as evidenced by the above-referenced letter, attached hereto that it was illegal to do so in the State of Texas. Clearly, Nationstar was selecting which modifications were economically favorable and then denying those that it did not deem substantial; even going so far as to recite Texas law (that it knew and understood) as the reason for denial. What matters is that Nationstar violated Texas lending laws

while certifying falsely, in annual Servicer Participation Agreements required under the Home Affordable Modification Program, that it was compliant with the state laws.

### 9. Examples of Nationstar Texas Modification Contracts

197.    Attached hereto as **Exhibit 16a and 17** are Texas contract examples followed by brief analyses. In each of these modifications the servicer advanced new sums to the borrower by adding to the principal balance, amounts not due or allowed under the original Note/Deed of Trust. These amounts included; 1) unloaned principal and fees/costs associated with the modification, 2) obligating the borrower for interest over the next some 25 years on the delinquent interest added to the principal balance, 3) new interest on the past due property taxes/escrow, 4) and the now accruing interest on the advanced amount not yet due of funds to be placed in the escrow account for future escrow expenses and paid over the next some 25 years. The Servicer increased the borrowers obligation by causing interest to now be required to be paid on the delinquent interest, the past due property taxes/escrow, the advanced but not yet due funds to be placed in the escrow account for future expenses, and any fees /costs associated with the modification and the interest now accruing on those fees/costs advanced.  These new advanced amounts/obligations carried the duty to meet the requirement of Texas Constitution Section 50(a)(6).

198.    New obligations, triggering the duty under Texas Constitution Section 50, are created for the borrower if the original Note/Deed of Trust did not require the establishment of an escrow account, but the establishment of an escrow account was a condition of approval for the modification, as was required for in every modification Relator Fisher has reviewed. It would also be a new obligation to the borrower when any extension of the original amortization schedule, as called for in the original Note/Deed of Trust, by virtue of the modification contract was extended.

This is an additional obligation due to causing the borrower an increased amount of interest to be paid, greater than that called for in the original Note/Deed of Trust over the term of the loan.

199.    Further, the extension of the amortization schedule wherein the loan is now with a modification not a fully amortizing loan within the term of the loan, as set forth in the original Note/Deed of Trust, whereby it causes the monthly payment to not fully pay down the principal within the loan term, and thereby creates a monthly short fall on paying down the principal each month that results in the creation of a Balloon Payment at the end of the loan term, that was not part of the original Note/Deed of Trust, creates a new credit transaction  under Texas Section 50(a)(6), and requires the servicer/lender the duty to meet those requirements of Texas Constitution.

200.    The following examples are included:

**Exhibit 16a**.    Servicer: Nationstar
Borrower: Mary & Charles Dillard
Loan No. 0596441229
City, State: DeSoto, TX 75115
New Advance of funds: Not disclosed.
New Principal Balance AFTER modification: $169,229.79
Start Date of Modification: November 2009
Violates 80%LTV:     A) Property Value on Modification Date - $157,000
B) 80% LTV on Modification date - $125,600
C) $ amount over 80% LTV - $43,629.79
<u>Credit Extension Type</u>: New Obligations not included in Original Contract

Texas State Violations within Section 50(a)(6), Article XVI, Texas Constitution,  on this contract:

1.    § 50(a)(6)(Q)(vi) – Appropriate language not provided
2.    §50(a)(6)(Q)(viii) – No Rescission form provided with contract
3.    §50(a)(6)(Q)(ix) – No written FMV acknowledgement provided
4.    §50(a)(6)(R)(5) – Loan Amount exceeded 80% LTV
5.    §50(a)(6)(N) – Loan not closed at permissible location

**Exhibit 17**.    Servicer: Nationstar
Borrower: Christopher Edwards

Loan No. 600464598
City, State: Converse, TX 78109
**New Advance of funds**: **$9,958.94 minimum** – Exact amount not
disclosed in contract to borrower .
New Principal Balance AFTER modification: $117,100.94
Start Date of Modification: January 1, 2013
New Interest on Interest Charges
Interest Charged on past due and any reserve amount for property taxes and
insurance premiums not allowed under the original note or deed of trust, nor
by State and Federal banking rules, regulations, and/or laws.
**Violates 80%LTV:** A) Property Value on May 21, 2014 by Appraisals -
$106,031
B) 80% LTV on May 21, 2014 - $82,424 or less
C) $ amount over 80% LTV - $34,676.94
Credit Extension Type: New advance of sums and new obligations that was
not included in the original contract.

Texas State Violations within Section 50(a)(6), Article XVI, Texas Constitution, on this contract:

1. § 50(a)(6)(Q)(vi) – Appropriate language not provided
2. §50(a)(6)(Q)(viii) – No Rescission form provided with contract
3. §50(a)(6)(Q)(ix) – No written FMV acknowledgement provided
4. §50(a)(6)(R)(5) – Loan Amount exceeded 80% LTV
5. §50(a)(6)(N) – Loan not closed at permissible location

Paragraph 1 of this Nationstar Modification contract states the following:

As of January, 2013, the amount payable under the Note and the
Security Instrument (the "Unpaid Principal Balance") is U.S.
$117,100.94 consisting of the amount(s) **loaned to the Borrower by
the Lender** and any interest and other amounts capitalized. (bold
&underline print added for emphasis).

First, Nationstar identifies itself as the Lender, suggesting that the new funds
advanced/loaned are from Nationstar Mortgage, LLC, rather than the Owner of the Loan. Second,
the contract clearly states that new funds are being loaned to the borrower which is **not** part of any
delinquent interest; that is, "other amounts capitalized."

Nationstar does not disclose (i) the principal balance prior to modification, (ii) how much
in new funds, especially the unloaned principal component in the past due monthly payments, are
being loaned, or (iii) detail as to exactly how much, and for what categories, funds are being loaned
and added to the principal balance. However, we have, attached, a copy of the Title Insurance for
this original loan, dated April 2, 2009. That policy, in paragraph 4, states the loan amount in April
2009 as $107,142.00. Therefore, if the new principal balance, as stated in the Modification contract

dated January 1, 2013, is $117,100.94, and there was absolutely no pay down of any principal over the past 3 years and 7 months, the minimum amount of new funds loaned is $9,958.94.

Based upon the language in the above paragraph, "consisting of the amount(s) loaned to the borrower by the Lender and any interest and *other amounts capitalized*," one can assume that there are "other amounts" included in the new funds added to the principal balance other than funds attributable to interest which likely do not arise out of the original note/deed of trust.

201.    As previously noted, modifications that increase the principal balance of loans constitute new credit extension, as declared in the *Sims* case, to the borrower, even if amounts previously owed but not paid are being capitalized, since the <u>capitalized sums accrue interest for the first time</u> and are secured by a different, <u>first lien security interest owing to the servicer</u>, not the owner/investor, in the equity of the homestead. That is the very essence of an "extension of credit."

### 10.    Homesteaders, In Effect, Become "Renters"

202.    When servicers add tens to hundreds of thousands of dollars of principal balance to the original note, while making "new extensions of credit" they make it virtually impossible for the borrower to ever have any hope of paying the loan off. As a result of the monetary increase in the principal balance, the new loan principal begins accruing its own interest. To make the payments affordable, many loans have stepped interest rates, deferred principal, partial amortization, and balloon payments, which result in a mortgage note that is not paid down in accordance with the **mandatory**, fully-amortizing requirement of § 50(a)(6)(L).

### B.    New York State Law

203.    New York Regulation 3 NYCRR § 419.11 states that servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable**" for borrowers, and

prevent foreclosure. Second, servicers are required to provide borrowers with written disclosures that clearly state the "**material terms, costs and risks**." 3 NYCRR 419.11(b) and (d). Nationstar pervasively violated both New York provisions, thus making Nationstar's certification of compliance [a condition of payment] with state [New York] laws in the initial SPA a fraudulent inducement of the United States to approve the SPA and purchase the Financial Instrument, and each year thereafter, a material false statement to the United States as a condition of payment.

### 1.    3 NYCRR § 419.11

204.    According to 3 NYCRR § 419.11, Servicers must take steps to ensure that borrowers are treated fairly in accordance with HAMP guidelines and rules established by the United States Department of Treasury. The Servicer is required to inform the borrower of the details of the loan, including the status of the default and all "loss mitigation" procedures and services that can be considered. 3 NYCRR § 419.11(a)(1). If requested, they are also required to "negotiate with the borrower in good faith, subject to the Servicer's duties and obligations under the mortgage servicing contract, if any, to attempt a resolution or workout of the delinquency or to prevent the borrower's default, including a loan modification." 3 NYCRR § 419.11(a)(2).

205.    In addition, § 419.11(b) of the regulation requires that:

> Loan modifications should be structured to result in payments that are ***affordable*** **and** ***sustainable*** for the borrower. Servicers that are participating in HAMP shall offer loan modifications in compliance with the HAMP guidelines or directives, including using reasonable efforts to remove prohibitions or impediments to their authority and to obtain third party consents and waivers that are required, by contract or law, in order to effectuate a loan modification under HAMP. (*emphasis added*).

206.     Based on the evidence, Nationstar did not adhere to these guidelines and, instead, provided modifications that were _not_ affordable or sustainable resulting in many borrower failures to perform the terms and conditions of the modified note.

207.     Moreover, upon information and belief, Nationstar did not provide borrowers with required written disclosures that clearly state the "material terms, costs and risks." 3 NYCRR 419.11(d) specifically requires that:

> Within 30 days of receiving all required documentation from the borrower and third parties, unless a shorter time is required under regulations or guidelines implementing HAMP, a Servicer shall complete its evaluation of the borrower's eligibility for a loan modification or other loss mitigation option requested by the borrower and advise the borrower, and if applicable, the borrower's authorized representative, in writing of its determination. Where the Servicer approves the borrower for a loan modification, _including_ a trial modification, or other loss mitigation option, the written notice _must provide_ the borrower with ***clear and understandable written information explaining the material terms, costs and risks*** of the option offered. (*emphasis added*).

 Upon information and belief, Nationstar's failure to provide these required disclosures were pervasive throughout New York.

208.     Finally, there is a presumption of good faith "if the Servicer offers loan modifications and other loss mitigation options in accordance with the HAMP guidelines…" 3 NYCRR § 419.11(i). Nationstar did not act in good faith, however, when it provided terms that were not conducive to the borrower avoiding foreclosure and saving the home on a long term basis. Similarly, the Servicer's pervasive **failures**, upon information and belief, to provide the mandated, written disclosures clearly disclosing the "**material terms, costs and risks**," constituted the second major prong for New York modification violations. *See* 3 NYCRR § 419.11(d). These New York state law violations, again, **rendered false** the Servicer's certification of compliance with

federal and state laws in the initial SPA which fraudulently induced the U.S. to approve the SPA and purchase the Financial Instrument, and was a false record which Nationstar used to obtain huge incentive payments each year thereafter, when Nationstar falsely re-certified legal compliance with federal and state laws to Fannie Mae.

209.    In *U.S. Bank Nat. Ass'n v. Padilla*, the bank was involved in "bad faith" loss mitigation negotiations with the borrower, "plunging her deeper and deeper into arrears, raising the very real probability that she will never be able extricate herself from this debt and work out an affordable loan modification." 31 Misc. 3d 1208(A) at *3 (N.Y. Sup. Ct. 2011). After more than a year of negotiations and settlement conferences, U.S. Bank and its representatives gave contradictory information and made "piecemeal requests" for documents that caused a delay in a decision on a HAMP or in-house modification. *Id*. This delay resulted in an increase in fees, interest, and penalties to the bank's benefit and "the homeowner's detriment." *Id.* The Court found that the bank also violated many of the subsections of NYCRR § 419.11 by not meeting the Servicer obligations regarding loss mitigation negotiations. The court stated that "in the wake of new legislation, decisions are beginning to emerge in which the courts are finding that the banks have engaged in discriminatory, unconscionable, and onerous lending practices and are now negotiating settlements of these oppressive loans in bad faith." *Id. See* also *Aurora Loan Services, LLC v. Dunning*, 2012 N.Y. Misc. LEXIS 2636 (N.Y. Sup. Ct. May 25, 2012). The *Padilla* Court recognized that these unlawful practices are common among mortgage loan servicers/banks. The *Dunning* Court similarly found a lack of good faith by the lender/servicer.

### 2.    Nationstar Example of NY Modification Contract

210.    Attached hereto as **Exhibit 16b** is a New York contract example. The following is an analysis of the exhibit:

**Exhibit 16b.**        Servicer: Nationstar
                Loan No. 0596450339
                City/State/Zip: Massena, New York 13662
                New Advance of funds: Not disclosed.
                New Principal Balance: $148,491.51
                Interest Bearing Principal Amount: $148,491.51
                Start Date: May 2012 (360 mo. Term)
                New Interest on Interest Charges
                Interest Charged on past due and any reserve amount for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.

Nationstar's violations of 3 NYCRR, § 419.11:

1. Section 419.11(d) – Requires that borrowers must receive **clear and understandable** written information explaining the material terms, costs and risks of the option offered.

    • The contract does not provide the borrower the amount of the "interest and expenses capitalized to date."
    • The contract does not inform the borrower that the amortization schedule is being reset. Less principal is being paid with each payment as a result of the reset.

2. Section 419.11(i) – There is the presumption of **good faith** "if the servicers offer borrowers a modification."

    The violations above demonstrate that there was a lack of "good faith" in the modification offered to the borrower

## C.    Massachusetts Law

211.    Similarly, upon information and belief, Nationstar lacked good faith negotiations with the borrowers in coming to agreements to modify mortgage loans. In its discussion of mortgage loan servicing practices, the Code of Massachusetts Regulations mandates that a third-

party loan servicer may not use "**unfair or unconscionable means**" when servicing a loan. 209

CMR § 18.21(1). The following conduct is prohibited:

> (a) Knowingly misapplying or recklessly applying loan payments to the outstanding balance of a loan.
>
> …
>
> (i) **Misrepresenting any material information** in connection with the servicing of the loan, including, but not limited to, **misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a loan, the terms and conditions of the servicing contract or the borrower's obligations under the loan**.

Upon information and belief, Nationstar violated this law as outlined by the Massachusetts' high

court below.

212.    Massachusetts also has stringent requirements for servicers. In its discussion of

mortgage loan servicing practice, the Code of Massachusetts' Regulations mandates that a third-

party loan servicer may not use **"unfair or unconscionable means"** when servicing a loan. 209

CMR § 18.21(1). The Code also prohibits "misrepresenting any material information [including]

the amount, nature or terms of any fee or payment due…and conditions of the servicing contract."

209 CMR § 18.21(1)(i). Massachusetts' law and regulations also require that lenders provide

borrowers with Notice of the Right of Rescission which provides the obligor a right to rescind a

consumer credit transaction that involves an added security interest in the principal dwelling of the

person. Mass. Gen. Laws Ch. 140D § 10(b).   Nationstar pervasively violated the duty under

Massachusetts law to provide borrowers the Notice of the Right of Rescission at the time of loan

modifications.  For this additional reason, Nationstar's initial and annual SPA

certifications/representations that it was "in compliance with all applicable Federal, state and local

laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** statements, certifications and records used to obtain huge incentive payments from the United States. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

213.    Under Massachusetts' UDAP law,[115] loans that are "doomed to foreclosure" are unfair. In *Commonwealth of Massachusetts v. Fremont Investment & Loan*, the highest court in Massachusetts affirmed a lower court's ruling that loans with a specific set of features were presumptively unfair, because the only way borrowers could avoid foreclosure was if housing values rose. 897 N.E.2d 548 (Mass. 2008) ("General Laws c. 93A, § 2 (a), makes unlawful any "unfair or deceptive acts or practices in the **conduct of any trade or commerce**."):

> More to the point, at the core of the judge's decision is a determination that when Fremont chose to combine in a subprime loan the four characteristics the judge identified, Fremont knew or should have known that they would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow unless residential real estate values continued to rise indefinitely - an assumption that, in the judge's view, logic and experience had already shown as of January, 2004, to be unreasonable.

> \*\*\*

> Fremont correctly points out that as a bank in the business of mortgage lending, it is subject to State and Federal regulation by a variety of agencies. Well before 2004, State and Federal regulatory guidance **explicitly warned** lending institutions making subprime loans that, even if they were in compliance with banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices" under G.L. c. 93A. Consumer Affairs and

---

[115] Mass. G.L. c. 93A, § 2.

Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997). More particularly, the principal had been clearly stated before 2004 that loans made to borrowers on terms that showed they **would be unable to pay and therefore were likely to lead to default were unsafe and unsound, and probably unfair**. Thus, an interagency Federal guidance published January 31, 2001, jointly by the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally **considered unsafe and unsound**" (emphasis supplied). Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001). On February 21, 2003, one year before the first of Fremont's loans at issue, the OCC warned that certain loans could be unfair to consumers:

When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. Not surprisingly, such credits experience foreclosure rates higher than the norm."[S]uch disregard of basic principles of loan underwriting lies at the **heart of predatory lending** ."OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 2 (Feb. 21, 2003).

*Id.* at 556-557;. At least one term in the Nationstar loan modifications have made foreclosure almost a certainty for borrowers unless housing prices increase dramatically. The loan modifications with escalating interest rates will become unaffordable unless the borrowers receive significant annual raises in their current income, find new sources of income, or housing prices rise enough that the borrowers can refinance or sell their homes. All of these scenarios seem unlikely, thus, their loan modification agreements have doomed them to foreclosure, likely in violation of laws like that of Massachusetts.

214.    Many Servicer modifications disclosed by Relator to the Government dramatically demonstrate that foreclosure is a virtual certainty for borrowers: The loan modifications with escalating interest rates will become unaffordable unless (i) housing prices increase dramatically allowing the borrower to sell or refinance or (ii) additional, large sources of income become available to the borrower. Therefore, these loan modification agreements doom borrowers to a foreclosure, likely in violation of Massachusetts' laws as declared by the Supreme Judicial Court of Massachusetts above.

### 1.    Mass. Right of Rescission

215.    The Massachusetts Consumer Credit Cost Disclosure Act (MCCCDA) determines the rights and liabilities of "consumer credit transactions."**, Mass. Gen. Laws ch. 140D § 10**. The Massachusetts legislature closely modeled the MCCCDA after TILA, making them materially the same.

216.    Massachusetts' **right of rescission** gives an "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of the person. Once an obligor rescinds the transaction, he is not liable for finance or other charge, and any security interest given by the obligor becomes void upon such rescission. *See***, Mass. Gen. Laws ch. 140D § 10(b).** Nationstar did not provide Massachusetts borrowers the required Notice, thus rendering false for this additional reason the initial and annual SPA certifications/representations executed by Nationstar that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…."

**2.      Examples of Nationstar's Massachusetts Modification Contracts**

217.      Attached hereto as **Exhibits 16c through 16d** are contract examples. The following

is analyses of the exhibits:

>   **Exhibit 16c.**          Servicer: Nationstar
>                             Loan No. 596736736
>                             City/State: 53 S. Bowdoin St., Lawrence, MA 01843
>                             New Advance of funds: A Minimum of **$93,548.06** (Approx.)
>                             New Principal Balance AFTER modification: $344,448.06
>                             Start Date of Modification: July 2013 (480 mo. term)
>                             New Interest on Interest Charges
>                             Interest Charged on past due and any reserve amount for property
>                             taxes and insurance premiums not allowed under the original note
>                             or deed of trust, nor by State and Federal banking rules, regulations,
>                             and/or laws.
>                             Monthly P&I: $1,007.71
>                             Balloon Payment: $103,443.42

- <u>Mass. Gen. Laws Ch. 140D § 10(b)</u>: No Notice of the Right of Rescission is provided to the borrower as required, independently, by Massachusetts law**.**

- <u>209 CMR § 18.21</u>:

    - Nationstar fails to provide the exact, itemized amount of funds being added to create the NEW principal balance is not disclosed; and
    - It further fails to provide specific amounts for any categories or detail of how the amount added was reached.
    - The contract does not inform the borrower that the amortization schedule is **being reset and extended by 15 years.** For the first 10 years, less principal is being paid with each payment as a result of the reset. This information is not disclosed to the borrower.
    - The contract calls for a **Balloon Payment** in the amount of $103,334.42, but does not disclose this to the borrower.

>   **Exhibit 16d.**          Servicer: Nationstar
>                             Loan No. 596865800
>                             City/State: 108 Highland St., Chelsea, MA 02150
>                             New Advance of funds: A Minimum of **$69,868.00** (Approx.)
>                             New Principal Balance AFTER modification: $387,108.00
>                             New Interest on Interest Charges

Interest Charged on past due and any reserve amount for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.
Start Date: April 2013 (480 mo. term)
Interest Bearing Principal: $254,529.31
Balloon Payment Amount Due: $132,578.69

- <u>Mass. Gen. Laws Ch. 140D § 10(b)</u>: No Notice of the Right of Rescission is provided to the borrower as required, independently, by Massachusetts law**.**

- <u>209 CMR § 18.21</u>:

  - Nationstar fails to provide the exact, itemized amount of funds being added to create the NEW principal balance is not disclosed; and
  - It further fails to provide specific amounts for any categories or detail of how the amount added was reached.
  - The contract calls for a **Balloon Payment** in the amount of $103,334.42, but does not disclose this to the borrower.

### D.  Additional State Fee Violations

218.    Some States have regulations regarding maximum fees charged to borrowers.  For instance, the State of Connecticut maximum fees allowed for a refinance is 5% or $2000 or, if the refinance is within 2 years, lenders must calculate the sum of fees charged on the prior mortgage and the refinance.[116]

219.    Nationstar has been violating the State of Connecticut mortgage regulations by charging beyond the maximum fees allowed. Further, Nationstar has no procedure in place to monitor or regulate fees charged according to States' requirements.  Relator Schimmelman originally brought this compliance issue to EVP, Steve Mix and SVP, Jim Gallagher's, attention

---

116 See Connecticut PA 01-34, available at http://www.cga.ct.gov/2002/rpt/2002-r-0855.htm (last visited 6/19/15)

in 2009.  According to Relator, Nationstar's response was that they understood there were State compliance issues and that Nationstar was doing a manual work around to correct the issue. Relator, again, brought the issue to management's attention in 2014. Upon information and belief nothing was done to remedy the issues and Nationstar continues to violate state law fee regulations.

## XIV. FAILURE BY NATIONSTAR TO SELF-REPORT

220.     As a participant in the government's Home Affordable Modification Program, Nationstar had the express, affirmative duty to notify Fannie Mae and Freddie Mac **immediately** in the event that any of the representations, warranties, or covenants made by Nationstar in the SPA ceased to be "true and correct."[117] Despite this directive, Nationstar has knowingly failed to notify the government of all violations committed by Nationstar and its third party contractors of which it was aware. Nationstar has knowingly violated this obligation to the United States, many thousands of times, when Nationstar knew of violations that had occurred.

221.     Specifically, Nationstar did not (1) operate in compliance with all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements;[118] (2) perform its services in accordance with high professional standards of care, using qualified individuals with suitable training, education, experience and skills;[119] or (3) responsibly supervise and manage third-party contractors to ensure that services were being performed in accordance with HAMP program requirements.[120] These latter, knowing failures and

---

[117] *See* Exhibits 1 and 2, Nationstar's Original and Amended and Restated SPA at Financial Instrument ¶ 5 "In the event that any of the representations, warranties, or covenants made herein ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately."

[118] *Id*. at Financial Instrument ¶ 5(b).

[119] *Id*. at Financial Instrument ¶ 5(d).

[120] *Id*. at Financial Instrument ¶ 6.

the knowing failure by Nationstar to properly report violations to Fannie Mae and Freddie Mac, as required by the SPA, render Nationstar's [time relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false.**

### A. Nationstar Email Policy – Deletion of Damaging Evidence

222.    Relators Schimmelman and Borse are aware that on June 27, 2014 Nationstar announced, in writing, to its employees that it would be **deleting all emails, company-wide, that were older than 90 days.**  This policy change was alarming to Relators. Subsequently, on September 17, 2014, Relator Schimmelman met with Nationstar's legal counsel and was assured that Nationstar had not yet implemented its retention policy to delete all emails, and that Nationstar would ensure any electronic information related to the issues raised by Relator Schimmelman would be preserved, all of which was false.  Relator Schimmelman has personal knowledge that emails were deleted and never reinstated.  Relator Borse also met with Nationstar legal counsel in September following the email policy announcement regarding her concerns. Despite being assured that none of her emails would be deleted, her emails were deleted. When Relator Borse requested that her emails be reinstated, her request was denied.  Consequent to the September meeting, Relator Borse was removed of her duties and relegated from a position as a decision maker to a position that handled more mundane tasks.

### XV.    FALSE CLAIMS ACT

223.    This is an action alleging violations of the federal False Claims Act, 31 U.S.C. §§

3729-32 and seeking damages, civil penalties and other statutory relief on behalf of the United States and the Relator as a result of the Defendants' false records, statements, and claims.

224.    The False Claims Act generally provides, *inter alia*, that any person who (i) knowingly presents or causes to be presented to the United States for payment or approval a false or fraudulent claim, *(ii) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim,* **and (iii)** is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim. 31 U.S.C. §§ 3729(a)(1)(G).

225.    The False Claims Act allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730(d). Relators claim entitlement to a portion of any recovery obtained by the United States as he is, on information and belief, the first to file, and is an original source for the information on which the allegations or transactions in the claims herein are based.

226.    Based on these provisions, Relators, on behalf of the United States Government, seek, through this action, to recover damages, civil penalties and all other statutory relief arising from the Defendants' submission of false and/or fraudulent claims for approval and/or payment and Nationstar's use of false records or statements that would be material to a decision of the United States to pay Nationstar requests under its contract. The United States has suffered significant actual damages as a result of the Defendants' false and fraudulent claims and its use of false records or statements material to false or fraudulent claims.

227.    As required under the False Claims Act, all Relators have provided the offices of the Attorney General of the United States and the United States Attorney for the Eastern District of Texas a disclosure statement of material evidence and information related to and supporting the allegations in this complaint before the filing of the Complaint.

228.    Nationstar falsely certified/represented in their original, standard form Servicer Participation Agreement (and exhibits) on or around May 28, 2009, **Exhibit 1** at p. 1**,** that they were in full compliance with all relevant laws, including but not limited to TILA, at the time of their execution of the (1) Servicer Participation Agreement and (2) Financial Instruments. Nationstar *falsely certified/represented, again*, on or about September 24, 2010 that they were in full compliance with all relevant laws,  at the time of their execution of the ***Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement***. **Exhibit 2**, Nationstar *Amended Servicer Participation Agreement*. By these and other material false certifications and false statements, Nationstar <u>fraudulently induced</u> the United States, through its Financial Agent, to enter the Agreement with Nationstar and <u>to purchase</u> the transactional Financial Instrument, the operative basis for the HAMP incentive payment. Nationstar made false subsequent annual Certifications to the United States annually, on or about June 1, 2010, June 1, 2011, June 1, 2012, and June 1, 2013 in the form set forth in the Servicer Participation Agreement, that it had and would comply with all relevant laws, including but not limited to TILA and other federal and state laws designed to prevent unfair, discriminatory or predatory lending practices, when it had not done so. Nationstar has knowingly failed to comply with numerous federal and state laws set forth hereinabove, all of which fraudulently induced Fannie Mae to execute the SPAs and the Financial Instrument by which Nationstar sought and collected significant sums of money

from the United States.   Moreover its false certifications/representations of compliance with the federal and state laws was material to the decision of the United States whether to pay incentive fees to Nationstar.

229.    Nationstar also knowingly and falsely certified/represented to the FHA that they were in compliance with all FHA and HUD regulations. By these individual material false certifications and false statements, Nationstar **fraudulently induced** the United States to authorize insurance claim payments from the FHA insurance fund, based upon the belief that Nationstar's certifications/representations of compliance with all FHA and HUD regulations were true when they were, in fact, not true.

230.    In addition to the HAMP incentive payments which were fraudulently induced by Nationstar, the United States is entitled to recover under the FCA similar relief for the fraudulently induced FHA and VA insurance payments requested by Nationstar. Similarly, Nationstar violated the FCA by making false statements about its compliance with applicable federal laws which were material to the decision of the United States to pay FHA and VA insurance payments requested by Nationstar.

## XVI.   CAUSES OF ACTION

### A.      First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)

231.    Relator re-alleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 230 of this complaint. Therefore, Nationstar has knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of **31 U.S.C. 3729(a)(1)(A).**

### B.      Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)

232.     Relator re-alleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 231 of this complaint. Therefore, Nationstar has knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of **31 U.S.C. § 3729(a)(1)(B). The false statements also included false statements and certifications made to <u>fraudulently induce</u> the U.S. to approve Nationstar's SPAs, to induce the U.S. to purchase Nationstar's Financial Instrument and to induce the United States to pay FHA and VA insurance payments to which Nationstar was not entitled.**

## PRAYER AND REQUEST FOR RELIEF

233.     On behalf of the United States, Relators seek to recover all relief available under the False Claims Act, as amended. Relators seek monetary damages equal to three (3) times the damages suffered by the United States. In addition, Relators seek to recover all civil penalties and other relief on behalf of the United States Government and the Relators in accordance with the False Claims Act.

234.     Relators should, for their contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relator's share pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

235.     Relators seek to be awarded all costs and expenses for this action, including statutory attorneys' fees, expenses, court costs and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

WHEREFORE, premises considered, Relators pray that this District Court enter judgment on behalf of the United States and against the Defendants for the following:

a.   damages in the amount of three (3) times the actual damages suffered by the United States and all statutory penalties arising from the Defendants' unlawful conduct which violated the FCA;

b.   a Relator's Share from the recoveries in a statutory amount which is fair and reasonable under the circumstances;

c.   Relators' statutory attorneys' fees, expenses, and costs of court;

d.   pre-judgment and post-judgment interest, at the highest rate allowed by law; and

e.   all other relief to which Relators and/or the United States may be justly entitled, whether at law or inequity, and which the District Court deems just and proper.

Dated: September 28, 2015

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher Douglas Albro, Paris Smith, Shaun Schimmelman and Maria Borse.**

Respectfully submitted:

By: _____
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe
Texas SBN: 10668280
BOYD & ASSOCIATES, PC
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
sboyd@boydfirm.com

*Counsel for Qui Tam Plaintiffs/Relators*

Roger D. Sanders, Esq.
J. Michael Young, Esq.
Sanders O'Hanlon, Motley & Young
111 S. Travis St.
Sherman, TX 75090
(903) 892-9133

*Local Counsel for Qui Tam Plaintiffs/Relators*

## CERTIFICATE OF SERVICE AND DISCLOSURE

On July 8, 2014 Relator Michael J. Fisher provided a copy of his Disclosure Statement to US Attorneys Sarah R. Saldana and Scott Hogan for the United States District Court for the Northern District of Texas, Dallas Division and US. Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C..

On January 5, 2015, June 19, 2015, July 1, 2015 copies of Supplemental Disclosure Statements of Relators Paris Smith, Maria Borse and Shaun Schimmelman, respectively, were provided to US Attorneys Clay Mahaffany for the Norther District of Texas, Dallas Division and to US Attorney John Black, Trial Counsel, Department of Justice, Washington D.C..

On September 28, 2015 Relators provided copies of their Disclosure Statement and Supplemental Disclosures to US Attorneys, Josh Russ and James Gillingham, for the Eastern District of Texas, Sherman Division and to US Attorney, John Black, Trial Counsel, Department of Justice, Washington D.C.

On September 29, 2015 a copy of Relators' file-marked Complaint filed *under seal* was formally served upon US Attorneys, Josh Russ and James Gillingham, for the Eastern District of Texas, Sherman Division and to US Attorney, John Black, Trial Counsel, Department of Justice, Washington D.C, and pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon:

Loretta Lynch
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Samuel L. Boyd

**Qui Tam Plaintiffs/Relators' Complaint**                                                            **125**